JOSEPH MIELE, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Dockets Nos. 405–70, 421–70—423–70.   Filed June 21, 1971.

---

[1] Cases of the following petitioners are consolidated herewith: V. James and Gloria Spiniello, docket No. 421–70; Anthony P. and Maria E. Miele, docket No. 422–70; and Luke C. and Grace Spiniello, docket No. 423–70.

*Martin D. Cohen* and *Samuel Klein*, for the petitioners.
*Robert N. Ginsburg*, for the respondent.

QUEALY, *Judge:* The respondent determined deficiencies in the Federal income taxes due from the petitioners as follows:

| Docket No | Year | Deficiency |
|---|---|---|
| 405–70 | 1965 | $7,679.52 |
|  | 1966 | 8,386.20 |
| 421–70 | 1965 | 7,354.70 |
|  | 1966 | 6,054.23 |
| 422–70 | 1965 | 5,799.74 |
|  | 1966 | 6,417.35 |
| 423–70 | 1965 | 5,777.85 |
|  | 1966 | 5,073.45 |

The issues presented for decision are:

(1) As to all dockets, whether petitioners, who own 100 percent of the voting stock of a corporation, are required to treat the prorata redemption of nonvoting stock held in proportion to their common stock holding as a dividend rather than as a return of capital.

(2) As to docket Nos. 421–70 and 423–70, whether petitioners must treat withdrawals from a corporation, 100 percent of the stock of which is owned by the petitioners, as dividends rather than loans.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Joseph Miele, petitioner in docket No. 405–70, is an individual residing in West Orange, N.J. Anthony P. Miele and Maria E. Miele, petitioners in docket No. 422–70, are individuals, husband and wife, also residing in West Orange, N.J.

V. James Spiniello and Gloria Spiniello, petitioners in docket No. 421–70, are individuals, husband and wife, residing in Short Hills, N.J. Luke C. Spiniello and Grace Spiniello, petitioners in docket No.

423–70, are individuals, husband and wife, also residing in Short Hills, N.J.

Petitioner Joseph Miele filed individual income tax returns for the taxable years 1965 and 1966 with the district director of internal revenue, Newark, N.J. Petitioners Anthony and Maria Miele, V. James and Gloria Spiniello, and Luke C. and Grace Spiniello filed joint income tax returns with the district director of internal revenue, Newark, N.J. All of the returns were filed on the cash basis.

Maria E. Miele, Gloria Spiniello, and Grace Spiniello are parties to this proceeding solely by virtue of the joint income tax returns which they filed with their respective husbands for the taxable years here involved.

## I. *Findings Related to the Preferred Stock Redemption Issue*

A & S Transportation Co. (hereinafter referred to as A & S) was incorporated under the laws of New Jersey on January 17, 1945. The original authorized capital of A & S, as provided for in its certificate of incorporation, consisted of 1,000 shares of common stock having a par value of $100 per share.

For some time prior to April 1959, there were 132 issued and outstanding shares of A & S common stock (as described above) which were held as follows:

| | | | |
|---|---|---|---|
| Joseph Miele | 21 | Joseph LaFera, Jr | 1 |
| Anthony Miele | 21 | LaFera Coal & Construction Co., | |
| Luke Spiniello | 21 | Inc. | 42 |
| James Spiniello | 22 | Virgilio Spiniello (Father of James | |
| J. Franklyn Ficken | 2 | and Luke) | 2 |
| Joseph LaFera, Sr | 1 | | |

On June 23, 1949, J. Franklyn Ficken sold and assigned his two shares of A & S stock to Joseph and Anthony Miele. The said two shares were transferred to Richard J. Miele, son of Anthony Miele, on August 26, 1962. Virgilio Spiniello died on January 20, 1962, bequeathing by will his share [2] of A & S stock to Luke Spiniello, who has since held a total of 22 shares.

LaFera Coal & Construction Co. was an equipment rental company owned by Joseph LaFera, Sr. and Joseph LaFera, Jr. On October 1, 1962, LaFera Coal & Construction Co. became a wholly owned subsidiary of LaFera Contracting Co. (hereinafter referred to as Contracting) in a tax-free reorganization. Thereafter, on September 3, 1963, LaFera Coal & Construction Co. was liquidated in accordance with a plan adopted on August 30, 1963, and Contracting succeeded to all

---

[2] The stipulation of facts specifies that only one share was bequeathed by Virgilio to Luke although the stipulation also specifies that Virgilio held two shares and does not set forth the disposition of the remaining share.

of the assets of LaFera Coal & Construction Co., including the 47 shares of A & S stock which it held.

At all times since its incorporation, A & S has been engaged in the business of moving sludge out to sea by means of one or more seagoing barges. For some time prior to April 1959, A & S carried on its business activities by the operation of a single barge called the *Dykes*.

By approximately 1956, the *Dykes* was in such a poor state of repair that maintenance costs were exceeding the value of the vessel. At a meeting of the board of directors of A & S held on September 15, 1957, it was noted that key employees of A & S had accepted notes in lieu of salary in order to free funds for the repair of the *Dykes*.

The management of A & S ascertained that a new vessel to replace the *Dykes* would cost approximately $545,000. Since A & S could not afford to make such a purchase without financing from outside sources, it entered into negotiations with the U.S. Maritime Commission (hereinafter sometimes referred to as the Maritime Commission or the Commission). This Commission, in furtherance of public policy, was empowered by applicable law to guarantee, in proper cases, fully secured first-mortgage loans made to domestic shipping companies to finance the purchase of seagoing vessels.

The Maritime Commission advised A & S that at least $150,000 of additional capital from private sources would have to be invested in the corporation before the loan could be guaranteed. The Maritime Commission also advised A & S that this requirement of additional private capital could be satisfied in either of the following ways:

(1) An unsecured loan for $150,000 which would be subordinated to the loan to be guaranteed by the Maritime Commission or

(2) The issuance of nonvoting, nondividend-paying, noncumulative preferred stock, having an aggregate par value of $150,000, which could not be redeemed until after full payment of the proposed first-mortgage loan.

The principals of A & S, including Anthony and Virgilio Spiniello, preferred the alternative of making an unsecured loan. However, they accepted the opinion of their adviser (one Samuel Klein, an attorney and certified public accountant) that the issuance of preferred stock would accomplish their entire purpose in the shortest time, and on March 30, 1959, by action of its board of directors, the certificate of incorporation of A & S was amended in pertinent part to provide as follows:

The total authorized capital stock of this corporation is Two Hundred Fifty Thousand ($250,000.00) Dollars, divided into three hundred (300) shares of preferred stock, of a par value of Five Hundred ($500.00) Dollars each, and One Thousand shares of common stock of the par value of One Hundred ($100.00) Dollars each.

The preferred stock shall be non-voting, non-dividend and non-cumulative and shall be redeemed by the corporation in full at par value ten years after April 15, 1959 and may be redeemed by the corporation at par value on or after July 15, 1964.

On April 13, 1959, A & S issued preferred stock to its common shareholders for cash as follows:

| Issued to | Number of shares | Par valu |
|---|---|---|
| Joseph Miele | 50 | $25, 000 |
| Anthony Miele | 50 | 25, 000 |
| Luke C. Spiniello | 50 | 25, 000 |
| V. James Spiniello | 50 | 25, 000 |
| LaFera Coal & Construction Co | 100 | 50, 000 |
| Total | 300 | 150, 000 |

The preferred stock certificates were stipulated to be "non-voting, non-dividend paying, non-cumulative," and were required "to be redeemed no later than 10 years after date of issuance." The preferred stock could also be redeemed prior to the expiration of this 10-year period but only after July 15, 1964, the prospective maturity date of the pending bank loan. A & S represented the certificates as preferred stock to the Maritime Commission, and A & S did not show the amounts received for the preferred stock as a loan in its tax returns.

On July 17, 1959, the board of directors of A & S authorized a bank loan of $380,000 to be secured by a first-preferred ship mortgage on the sludge barge *Judson K. Stickle* which was to be purchased as a replacement for the *Dykes*. The loan was to be repayable in 60 equal consecutive monthly installments of $5,000 and a final "balloon" payment of $80,000. Interest, payable monthly, was to be at the rate of 5 percent per annum.

The $380,000 bank loan was consummated on July 31, 1959, on essentially the terms set out above. The first-preferred ship mortgage, which A & S executed on this same date, had a stated maturity date of August 31, 1964. The mortgage expressly prohibited the payment of any dividend or repayment of an indebtedness to a stockholder "so long as this Mortgage and any installment of the Mortgage Note is outstanding."

The sludge barge *Judson K. Stickle* was delivered to A & S on July 31, 1959. Thereafter, A & S operated the *Judson K. Stickle* and made the payments due under the mortgage note given by A & S at the closing, the last of such payments being made on or about August 31, 1964.

On May 14, 1965, the board of directors of A & S, at the insistence of the shareholders, resolved to redeem 150 shares of the preferred stock from the holders of record in proportion to their holdings. On or about

May 14, 1965, A & S, pursuant to this resolution, acquired one-half of the preferred stock from its shareholders:

| Shareholder | Number of shares redeemed | Amount paid by A & S for the stock |
|---|---|---|
| LaFera Contracting Co., Inc. | 50 | $25,000 |
| Luke C. Spiniello | 25 | 12,500 |
| V. James Spiniello | 25 | 12,500 |
| Joseph Miele | 25 | 12,500 |
| Anthony P. Miele | 25 | 12,500 |
| Total | 150 | 75,000 |

On or about January 2, 1966, the board of directors of A & S, again at the insistence of the shareholders, resolved to redeem the remaining 150 shares of the preferred stock. On or about January 2, 1966, A & S, pursuant to this resolution, acquired the remaining one-half of the preferred stock as follows:

| Shareholder | Number of shares redeemed | Amount paid by A & S for the stock |
|---|---|---|
| LaFera Contracting Co., Inc. | 50 | $25,000 |
| Luke C. Spiniello | 25 | 12,500 |
| V. James Spiniello | 25 | 12,500 |
| Joseph Miele | 25 | 12,500 |
| Anthony P. Miele | 25 | 12,500 |
| Total | 150 | 75,000 |

## II. *Findings Related to the Dividend vs. Loan Issue*

Spiniello Construction Co. (hereinafter referred to as Construction) was incorporated in 1922 under the laws of the State of New Jersey. At all times material to this proceeding, Construction has been engaged in the general contracting business, specializing in the cement lining of watermains.

Construction maintains its financial books of account and files its Federal income tax returns on a calendar year basis using the cash receipts and disbursements accounting method. Construction's regularly maintained books of account include a general journal, a general ledger, and cash receipts and disbursements journals. Since approximately 1950, Construction's books of account have been audited at least annually by the Newark, N.J., accounting firm of Samuel Klein & Co.

At all material times herein, the paid-in capital of Construction has been in the amount of $14,800. Since the death of their father, Virgilio, in 1962, Luke and V. James Spiniello have each owned one-half of the outstanding capital stock of Construction.

V. James Spiniello transferred money between Construction and himself from 1953 through 1968 by the use of three accounts carried

on the general ledgers of Construction as loan accounts. During this same period from 1952 through 1968, Luke C. Spiniello also transferred money between Construction and himself and his wife by the use of accounts carried on the general ledgers of Construction as loan accounts in the name of Luke and his wife, Grace. The history of these accounts for V. James and Luke C. Spiniello during the period of 1953 through 1968 in net figures is as follows:

### V. James Spiniello

| Year | Balance as of Jan. 1 | Loans from Construction to V. James | Repayments | Net year end balance |
|------|------|------|------|------|
| 1953 | | $237 | | $237 |
| 1954 | $237 | 5,730 | $168 | 5,799 |
| 1955 | 5,799 | 5,890 | 400 | 11,289 |
| 1956 | 11,289 | 11,538 | 17,928 | 4,899 |
| 1957 | 4,899 | 17,990 | 22,889 | 0 |
| 1958 | 0 | 12,881 | 22,443 | [1] [9,562] |
| 1959 | [9,562] | 53,041 | 41,037 | 2,442 |
| 1960 | 2,442 | 20,625 | 17,742 | 5,325 |
| 1961 | 5,325 | 23,629 | 18,077 | 10,877 |
| 1962 | 10,877 | 33,716 | 23,200 | 21,393 |
| 1963 | 21,393 | 811 | | 22,204 |
| 1964 | 22,204 | 9,500 | 11,620 | 20,084 |
| 1965 | 20,084 | 71,884 | 61,614 | 30,354 |
| 1966 | 30,354 | 3,500 | | 33,854 |
| 1967 | 33,854 | 14,000 | 14,800 | 33,054 |
| 1968 | 33,054 | | 26,800 | 6,254 |

[1] This represents the amount owed V. James Spiniello by Construction at the end of 1958 due to an excess of repayments over withdrawals.

### Luke C. Spiniello and Grace Spiniello

| Year | Balance as of Jan. 1 | Loans from Construction to Luke C. | Repayments | Net year end balance |
|------|------|------|------|------|
| 1952 | $3,428 | | | $3,428 |
| 1953 | 3,428 | $237 | | 3,665 |
| 1954 | 3,665 | 237 | $700 | 3,202 |
| 1955 | 3,202 | 4,090 | 1,300 | 5,992 |
| 1956 | 5,992 | 10,037 | 16,500 | [1] [471] |
| 1957 | [471] | 15,500 | 15,729 | [700] |
| 1958 | [700] | 9,087 | 18,083 | [9,696] |
| 1959 | [9,696] | 48,221 | 49,453 | [10,928] |
| 1960 | [10,928] | 15,550 | 16,387 | [11,765] |
| 1961 | [11,765] | 14,004 | 13,347 | [11,108] |
| 1962 | [11,108] | 35,616 | 23,500 | 1,008 |
| 1963 | 1,008 | 3,992 | 2,800 | 2,200 |
| 1964 | 2,200 | 5,000 | 4,000 | 3,200 |
| 1965 | 3,200 | 50,394 | 44,124 | 9,470 |
| 1966 | 9,470 | 0 | 0 | 9,470 |
| 1967 | 9,470 | 0 | 7,800 | 1,670 |
| 1968 | 1,670 | 0 | 6,200 | [4,530] |

[1] Bracketed figures represent the amounts owed Luke and/or Grace Spiniello by Construction where the balance of repayments exceeds the amounts withdrawn.

There were no notes made, no interest paid, and no collateral given with respect to these withdrawals.

With respect to the withdrawals, V. James, Luke C., and before them their father, Virgilio Spiniello, had been informed by Samuel Klein, their financial adviser, that it was permissible to borrow money

from Construction without interest provided that the withdrawals were properly documented and repaid.

### ULTIMATE FINDINGS OF FACT

1. *Preferred stock redemption issue.—*

(a) The preferred stock issued by A & S and later redeemed in accordance with the terms of the stock certificate was preferred stock and not evidence of indebtedness.

(b) The prorata distributions made by A & S in redemption of its preferred stock were essentially equivalent to a dividend and do not qualify as a distribution or payment in exchange for stock under section 302(a)[3].

2. *Dividend vs. loan issue.—*At all times, petitioners intended to repay the withdrawals. Consequently, the amounts shown on the general ledgers of Construction as loans to V. James Spiniello and Luke C. and Grace Spiniello were bona fide loans and do not constitute dividends.

### OPINION

### I. *Question With Respect to the Stock Redemption by A & S Corporation*

A & S engaged in the business of operating a seagoing barge. In 1959 A & S decided to purchase a new barge and entered into negotiations to finance the acquisition. One aspect of the negotiations including obtaining a guarantee by the U.S. Maritime Commission of a fully secured first-mortgage loan. The Maritime Commission advised A & S that at least $150,000 of additional capital from private sources would have to be invested in the corporation before the loan could be guaranteed.

The Maritime Commission posed two alternatives for providing for the additional capital: (1) An unsecured loan subordinated to the guaranteed note or (2) An issue of preferred stock. The board of directors of A & S adopted the alternative of issuing preferred stock as a means of investing the additional capital. The stockholders invested in the newly created preferred stock in proportion to their holdings in the common stock of A & S. As a result of this additional capital, the Maritime Commission guaranteed the first-mortgage loan thus enabling A & S to acquire a new barge.

A & S took possession of the the new barge on July 31, 1959. Thereafter it operated the barge and amortized the note guaranteed by the

---

[3] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

Maritime Commission making the final payment on or about August 31, 1964.

On May 14, 1965, the board of directors of A & S, at the insistence of the shareholders, decided to redeem one-half of the outstanding preferred stock in proportion to the ownership thereof. On January 2, 1966, the balance of the preferred stock was redeemed. The redemptions were pro rata, and after each redemption the shareholders occupied exactly the same relationship with respect to the ownership of A & S as they did before the redemption.

Initially, the petitioners contend that the "preferred stock" in this case was evidence of debt and not equity. We cannot accept this argument.

No all-encompassing rule has been evolved and accepted for application in all cases to determine whether the obligations in question in a particular case are evidence of equity investment in the corporations involved or are evidence of indebtedness. It is clear that no single characteristic is determinative in all cases and that the basic question of whether the holders of the obligations are stockholders or creditors must be determined by an analysis of all relevant factors. *John Kelley Co.* v. *Commissioner*, 326 U.S. 521 (1943); *Ragland Investment Co.*, 52 T.C. 867 (1969).

The Maritime Commission required that $150,000 of additional capital be invested in A & S before the Commission would guarantee the loan for the acquisition of a new barge. The Maritime Commission gave the petitioners the alternatives of either a loan or an issue of preferred stock as a means of providing for this additional capital. Thus, the petitioners were in a position to control the nature of the investment. They chose the preferred stock or equity investment over the debt method of financing, and having made this choice, petitioners cannot escape from the statutory consequences of their decision by arguing that the transaction could have been arranged in another way with different consequences. *Wiseman* v. *United States*, 371 F. 2d 816 (C.A. 1, 1967); *United States* v. *Collins*, 300 F. 2d 821 (C.A. 1, 1962); *Pacific Southwest R. Co.* v. *Commissioner*, 128 F. 2d 815 (C.A. 9, 1942); *Commissioner* v. *Kolb*, 100 F. 2d 920 (C.A. 9, 1938); Cf., *Gray* v. *Powell*, 314 U.S. 402, 414 (1941).

In addition, there are numerous other factors which indicate that the certificates in question represent equity and not debt. The certificates were labeled, structured, and repeatedly referred to throughout as preferred stock. While the name given to a security is not necessarily determinative in regards to its nature, the nomenclature used by the parties is a factor which cannot be ignored. *Crawford Drug Stores* v. *United States*, 220 F. 2d 292 (C.A. 10, 1955); *John Wanamaker*

*Philadelphia* v. *Commissioner*, 139 F. 2d 644 (C.A. 3, 1943); *First Mortgage Corp.* v. *Commissioner*, 135 F. 2d 121 (C.A. 3, 1943).

The attorney-adviser for A & S, Samuel Klein, readily admitted to the Court that if the corporation went into receivership, the holders of the certificates here in question could not file claims as creditors.[4] Since it is a normal characteristic of a creditor relationship that the creditors share in the assets of a corporation before the stockholders (the preferred stockholders sharing in the assets before any other class of stock) or any other group in the event of a liquidation or dissolution of the corporation, the rights of the holders of the certificates in question herein are in essence subordinated to the rights of the general creditors of the A & S corporation. This factor of subordination is generally regarded as indicative of an equity as opposed to a creditor interest. *Milwaukee & Suburban Transport Corporation* v. *Commissioner*, 283 F. 2d 279 (C.A. 7, 1960), certiorari denied 366 U.S. 965 (1961), remanded on another issue 367 U.S. 906 (1961); *John Wanamaker Philadelphia* v. *Commissioner, supra; First Mortgage Corp.* v. *Commisioner, supra.*

If a creditor-debtor relationship had been intended, it would have only been necessary for the board of directors of A & S to authorize the execution of bonds or notes. It would not have been necessary for the board to amend the certificate of incorporation of A & S to provide for an increase in the amount of authorized capital stock. The fact that the board of directors of A & S took this latter action tends to indicate that the board intended to create additional capital stock or equity. *John Wanamaker Philadelphia* v. *Commissioner, supra.*

The certificates in question did not provide for the payment of any interest, and we consider this absence of an interest element as indicating that the purported debt was in reality a capital contribution. *Road Materials, Inc.* v. *Commissioner*, 407 F. 2d 1121 (C.A. 4, 1969); *Curry* v. *United States*, 396 F. 2d 630 (C.A. 5, 1968), certiorari denied 393 U.S. 967 (1968); *Alfred R. Bachrach*, (18 T.C. 479 (1952), affd. 205 F. 2d 151 (C.A. 2, 1953).

Furthermore, the purported debt in this case was held by the petitioners in proportion to their respective stockholdings. While such proportionality by itself is not sufficient to establish that purported debt is in fact equity, *Piedmont Corporation* v. *Commissioner*, 388 F. 2d 886, 889 (C.A. 4, 1968), and *Liflans Corporation* v. *United States*,

---

[4] Under New Jersey law, it is apparent that the certificates in question would be classified as preferred stock. See *Hilson Co.* v. *State Board of Assessors*, 82 N.J.L. 2, 80 Atl. 929 (1911). As preferred stock, the redemption preference established by the certificates could only be enforced when it would not render A & S insolvent. *Mueller* v. *Kraeuter & Co.*, 131 N.J. Eq. 475, 25A. 2d 874 (Ch. 1942). Thus, the certificates did not establish debt but only created a preference for the holders of the certificates over the rights of the common stockholders.

390 F. 2d 965, 971 (Ct. Cl. 1968), it is a factor which is indicative of an equity interest as opposed to a debt interest. *Charter Wire, Inc.* v. *United States*, 309 F. 2d 878 (C.A. 7, 1962) ; *P. M. Finance Corporation* v. *Commissioner*, 302 F. 2d 786 (C.A. 3, 1962) ; *Gilbert* v. *Commissioner*, 248 F. 2d 399 (C.A. 2, 1957).

When A & S sought to demonstrate to the United States Maritime Commission that it had provided for the increase in the equity interest in the corporation which the Commission had requested, the certificates in question were represented to the Commission as preferred stock. Such a representation is indicative of an intention to create equity and not debt. *Milwaukee & Suburban Transport Corporation* v. *Commissioner*, *supra*. See also *Lee Telephone Co.* v. *Commissioner*, 260 F. 2d 114 (C.A. 4, 1958).

In addition, A & S did not show the amounts it received for the issuance of its preferred stock as a loan on its tax returns. We consider such corporate treatment of the amounts involved as evidence of the fact that the certificates were equity and not debt. Cf. *First Mortgage Corp.* v. *Commissioner*, *supra* at 123, 124 (where the failure of the corporation to follow the usual procedures associated with debt was considered as evidence that debt was not intended), and *Byerlite Corporation* v. *Williams*, 286 F. 2d 285, 290 (C.A. 6, 1960) (where the corporate treatment of amounts received was regarded as evidence of whether or not there was an intention to create a debt).

The existence of a definite maturity date is a significant factor indicating the existence of a debtor-creditor relationship. *Wood Preserving Corporation of Baltimore* v. *United States*, 347 F. 2d 117, 119 (C.A. 4, 1965) ; *Parisian, Inc.* v. *Commissioner*, 131 F. 2d 394 (C.A. 5, 1942) ; *Commissioner* v. *Schmoll Fils Associated*, 110 F. 2d 611, 613 (C.A. 2, 1940) ; see also sec. 385(b) (1), I.R.C. 1954, added by sec. 415(a) of the Tax Reform Act of 1969. While the certificates in question do have such a definite maturity date in that they must be redeemed at the end of a specified period of time, we do not consider this as conclusive of the character of the certificates, *Consumers Credit Rural Electric Coop. Corp.* v. *Commissioner*, 319 F. 2d 475 (C.A. 6, 1963) ; *Crown Iron Works Co.* v. *Commissioner*, 245 F. 2d 357 (C.A. 8, 1957) ; *Kentucky River Coal Corporation*, 3 B.T.A. 644 (1926), as it is not unusual for preferred stock to have a maturity date. *Charles L. Huisking & Co.*, 4 T.C. 595, 599 (1945). Rather, we have weighed this factor with all other factors present in this case, and we hold that the indicia of equity predominate with certainty. Accordingly, we have concluded that the certificates in question were in fact preferred stock as opposed to evidence of indebtedness.

Having disposed of petitioner's initial contention, we must now consider their second argument. The petitioners stress that the preferred

stock was issued because the Maritime Commission required them to invest an additional $150,000 of capital in the corporation as a condition precedent to its guaranteeing of the loans which were necessary to enable A & S to finance the acquisition of a new barge. They argue that the preferred stock was no longer needed after the loan had been paid in full and that redemption of the stock was consistent with the business purpose for which the stock was issued. On this basis, they conclude that the redemption transaction was within the protection of section 302(b)(1).

We consider this argument as having been foreclosed and the issue determined by the case of *United States* v. *Davis*, 397 U.S. 301 (1970). In *Davis*, the United States Supreme Court held that a redemption without a change in the relative economic interests or rights of the stockholders is always essentially equivalent to a dividend under section 302(b)(1). It is the effect of the redemption and not the purpose behind it which is determinative of dividend equivalence. See also *Hasbrook* v. *United States*, 343 F. 2d 811 (C.A. 2, 1965); *Kessner* v. *Commissioner*, 248 F. 2d 943 (C.A. 3, 1957); and *Ray A. Maher*, 55 T.C. 441 (1970). Hence, we hold that in this case, where the redemption of the preferred stock of A & S in two equal installments did not change the relative economic interests, control, or rights of the stockholders (the petitioners herein), the redemption was essentially equivalent to a dividend and does not qualify as a distribution or payment in exchange for the stock.

## II. *Question With Respect to Withdrawals From Construction*

The controlling factor in the determination of this issue is whether at the time the withdrawals in question were made, the parties intended that the amounts withdrawn be repaid. *Berthold* v. *Commissioner*, 404 F. 2d 119 (C.A. 6, 1968), affirming a Memorandum Opinion of this Court; *Commissioner* v. *Makransky*, 321 F. 2d 598 (C.A. 3, 1963); *Al Goodman, Inc.*, 23 T.C. 288 (1954); *W. T. Wilson*, 10 T.C. 251 (1948). If repayment was intended at the time of withdrawals, the amounts are generally considered loans. On the other hand, if no repayment was intended at the time of the withdrawals, the amounts are to be considered dividends.

This question of intention is a factual issue to be determined from all the factors and circumstances present in a case. *Berthold* v. *Commissioner, supra; W. T. Wilson, supra.* In making this determination, we recognize that the respondent's determination that the withdrawals in question were dividends and therefore taxable income is presumptively correct and that petitioners have the burden of proving that respondent's determination was erroneous. *Welch* v. *Helvering*, 290 U.S. 111 (1933); *G. E. Employees Securities Corporation* v. *Manning*, 137

F. 2d 637 (C.A. 3, 1943). We hold that petitioners have sustained their burden.

In this case, loan accounts between Construction and V. James Spiniello and Construction and Luke C. and Grace Spiniello have been in existence and carried in the general ledger of Construction since as early as 1952. The transfer of money between these petitioners and Construction was carried out in this manner after V. James, Luke C., and their father, Virgilio Spiniello, before them had been told by their financial adviser that it was permissible to borrow money from Construction. Furthermore, the withdrawals were not proportional to the stockholdings of V. James and Luke C.

Analysis of the loan accounts in question reveals a long history of repayment by the petitioners of substantial amounts of the sums withdrawn prior to the 1967 tax audit (at which time no repayment of sums withdrawn in 1965 had been made) by a revenue agent of the respondent. In the case of V. James Spiniello, the records indicate repayments of amounts borrowed prior to 1965 in each of the years 1954 through 1962 and again in 1964 and 1965. With respect to the years 1956 through 1962 and 1964 and 1965, the amounts of the repayments in comparison to the amounts owed were substantial and not merely nominal. In the case of Luke C. and Grace Spiniello, the amounts of the repayments were substantial in comparison to the amounts owed in each of the years 1954 through 1965. In addition, the loan accounts indicate that due to over-repayment of the amounts for which petitioners were indebted, Construction owed V. James money in 1958 and owed Luke C. and Grace Spiniello money in each of the years 1956 through 1961.

While no one of these factors standing by itself is sufficient to establish that the withdrawals in question were loans,[5] together they indicate a definite intention on the part of the petitioners to repay the amounts withdrawn and lead us to conclude that the withdrawals were bona fide loans and not dividends. The fact that Construction loaned

---

[5] As to the insufficiency of merely the testimony of the petitioners' as to their intentions and the circumstances of the withdrawals to compel loan treatment, see *Estate of Isadore Benjamin*, 28 T.C. 101 (1957). As to the insufficiency of books and records by themselves to establish the existence of a loan, see *Elliott J. Roschuni*, 29 T.C. 1193 (1958), affirmed per curiam 271 F. 2d 267 (C.A. 5, 1959), and *William C. Baird*, 25 T.C. 387 (1955).

While not conclusive, repayment by a shareholder of advances made to him by the the corporation supports an inference that a loan was intended, *Al Goodman, Inc.*, 23 T.C. 288 (1954); *Carl L. White*, 17 T.C. 1562 (1952); *Herman M. Rhodes*, 34 B.T.A. 212 (1936). Repayment before a tax audit is, of course, more persuasive evidence of an intention to create a debt than repayment after such an audit has commenced. *A. J. Dalton*, T.C. Memo. 1957–20; *Leroy B. Williams*, T.C. Memo. 1955–325.

As to the effect of withdrawals in proportion or disproportion to stockholdings on the question of loan vs. dividend treatment of the withdrawal, see *Clark* v. *Commissioner*, 266 F. 2d 698 (C.A. 9, 1959), affirming on this ground a Memorandum Opinion of this Court; *Lincoln Nat. Bank* v. *Burnet*, 63 F. 2d 131 (C.A.D.C. 1933); *Elliott J. Roschuni*, 29 T.C. 1193 (1958), affirmed per curiam 271 F. 2d 267 (C.A. 5, 1959).

money to shareholders without security, notes, or interest does not compel an opposite conclusion for such occurrences are not uncommon in dealings between shareholders of a closely held corporation and the corporation. *Carl L. White,* 17 T.C. 1562 (1952).

> *Decisions will be entered for the respondent in dockets Nos. 405–70 and 422–70.*
>
> *Decisions will be entered under Rule 50 in dockets Nos. 421–70 and 423–70.*