T.C. Memo. 1999-36


UNITED STATES TAX COURT


PEOPLEFEEDERS, INC. AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 10864-96.                    Filed February 4, 1999.


        <u>Held</u>:  Under the facts of this case, the fact that
    respondent's notice of deficiency indicated that
    petitioner's taxable years ended on June 30 of each
    year rather than on the actual last day of petitioner's
    taxable years does not invalidate respondent's notice
    of deficiency and does not deprive the Court of subject
    matter jurisdiction.

        <u>Held</u>, <u>further</u>, Petitioner's claimed $3,751,930 bad
    debt deduction for petitioner's 1992 taxable year and
    net operating loss carrybacks and carryforwards
    relating thereto are denied.


    <u>Charles O. Cobb</u>, <u>Thomas M. Cryan</u>, and <u>Mark A. Krasner</u>, for

petitioner.

    <u>Robert J. Burbank</u> and <u>Thomas C. Pliske</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, Judge:  Respondent determined deficiencies in petitioner's consolidated Federal income taxes in the respective amounts of $28,415, $22,495, $465,115, $24,108, and $45,837 allegedly for petitioner's 1990, 1991, 1992, 1993, and 1994 taxable years.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are:  (1) Whether deficiency determinations for petitioner's taxable years 1990 through 1994 were made in respondent's notice of deficiency, as respondent contends, or whether deficiency determinations against petitioner for nonexistent years were made in respondent's notice of deficiency, as petitioner contends, making respondent's deficiency determinations defective and depriving the Court of subject matter jurisdiction over petitioner's tax liabilities; and (2) if the above issue is resolved in favor of respondent, whether petitioner is entitled to a $3,751,930 claimed bad debt deduction for petitioner's 1992 taxable year and net operating loss (NOL) carrybacks and carryforwards relating thereto.

## FINDINGS OF FACT

Some of the facts are stipulated and are so found.

At the time the petition was filed, petitioner's principal place of business was located in San Diego, California.

Prior to July 1, 1987, Karl Motsenbocker (Motsenbocker) owned 82.5 percent of the shares of stock in Peoplefeeders, Inc., a closely held California corporation that was the parent corporation of a group of affiliated corporations that owned and operated a chain of pizza restaurants under the name of Square Pan Pizza.

In the summer of 1987, Jeffrey Partrick (Partrick) and three other individuals formed HPPW Restaurants, Inc. (HPPW), and on July 1, 1987, HPPW acquired for $3,317,560 all of Motsenbocker's shares of stock in Peoplefeeders and Motsenbocker's ownership interest in a related partnership.

The $3,317,560 purchase price for the stock in Peoplefeeders and for the related partnership interest was reflected by and was to be paid as follows:

| Form of Payment | Amount |
|---|---|
| Cash at closing | $ 167,560 |
| Promissory notes* due: | |
| Sept. 1, 1987 | 150,000 |
| Mar. 31, 1988 | 1,500,000 |
| June 30, 1992 | 1,500,000 |
| Total | $3,317,560 |

> \* Interest accrued on the promissory notes at an annual rate of 3-1/4 percent over the prime rate.[1]

--------

[1] After July 1, 1990, the interest rate on the June 30, 1992, promissory note increased to 3-3/4 percent over the prime rate and after July 1, 1991, the interest rate on the third promissory

(continued...)

Upon HPPW's acquisition of the stock in Peoplefeeders, HPPW became the parent corporation of Peoplefeeders, and HPPW changed its name to Peoplefeeders. The former Peoplefeeders corporate entity changed its name to Square Pan Pizza Co. of California, Inc. (Square Pan), and remained parent to other subsidiary corporations that owned and operated restaurants. Hereinafter, references to Peoplefeeders and to Square Pan are to those parent and subsidiary corporate entities as they existed and operated after the July 1987 acquisition and name change of the corporations.

On August 11, 1987, Peoplefeeders obtained a $1.7 million loan from California Commerce Bank (Commerce Bank), reflected by a promissory note in favor of Commerce Bank payable in 53 monthly installments of $32,075 with interest at 2-1/2 percent over prime and due in full on June 5, 1992.

On March 31, 1988, using proceeds from the $1.7 million Commerce Bank loan, Peoplefeeders paid Motsenbocker the $1.5 million due on that date relating to HPPW's acquisition of Motsenbocker's stock interest in Peoplefeeders.

With regard both to the $1.5 million debt obligation owed to Motsenbocker and the $1.7 million loan obtained from Commerce Bank, the board of directors of Peoplefeeders formally acted on and approved such debt obligations. Promissory notes were issued

---

(...continued)
note increased to 4-1/4 percent over the prime rate.

by Peoplefeeders in favor of Motsenbocker and Commerce Bank relating thereto, and the debt obligations were secured by personal guarantees of Partrick, by corporate guarantees of Square Pan and the other subsidiaries, and by collateralization of the operating assets of Square Pan and the other subsidiaries.

As of early fall of 1987, Square Pan and the other subsidiaries owned and operated 25 restaurants and other businesses (namely, a wholesale food supplier and a food concession). At that time, Peoplefeeders did not separately own or operate any restaurants, and Peoplefeeders had no source of income from any business other than Square Pan.

In the fall of 1987, Peoplefeeders purchased and began operating one Arby's restaurant. In 1988, Peoplefeeders opened a pizza restaurant, but it was unsuccessful and closed within a year. In 1990, Peoplefeeders opened another pizza restaurant, but this restaurant also was unsuccessful and closed within a year.

Intercompany Bank Account

Each of the restaurants owned and operated by Peoplefeeders, by Square Pan, and by the other related subsidiaries maintained separate bank accounts at different banks, and cash receipts from operations of each restaurant were deposited daily into the separate bank accounts maintained by each restaurant. Three times a week, the total cash receipts from all of the restaurants

for the prior few days were withdrawn from the separate bank accounts maintained by each restaurant and were transferred into a single bank account maintained at Commerce Bank under the name of Square Pan. This bank account will be referred to hereinafter as the Intercompany bank account.

All of the business expenses relating to Peoplefeeders, to Square Pan, to the related subsidiaries, as well as all of the business expenses relating to the restaurants owned and operated by the various related corporate entities, were paid by checks drawn not on the separate bank accounts maintained by each restaurant, but by checks drawn on the Intercompany bank account. Payments made to Motsenbocker and to Commerce Bank with regard to Peoplefeeders' loan and debt obligations described above also were made by checks drawn on the Intercompany bank account.

For the years in issue, total cash receipts that Peoplefeeders received and transferred into the Intercompany bank account were sufficient in amount to cover Peoplefeeders' total operating expenses, but they were not sufficient to cover the loan payments Peoplefeeders owed to Motsenbocker and to Commerce Bank. Accordingly, the difference between the total cash receipts transferred by Peoplefeeders into the Intercompany bank account and the total of Peoplefeeders' expenses and loan payments that were paid out of the Intercompany bank account increased each year from 1987 until May 1992, as follows:

| Taxable Year | Peoplefeeders' Cash Receipts Transferred Into Intercompany Bank Account | Peoplefeeders' Expenses And Loan Payments Paid Out Of Intercompany Bank Account | Difference |
|---|---|---|---|
| 1988 | $ 782,266 | $1,449,289 | $ 667,023 |
| 1989 | 690,964 | 1,454,344 | 763,380 |
| 1990 | 902,115 | 1,530,067 | 627,952 |
| 1991 | 1,053,523 | 1,490,889 | 437,366 |
| 1992 | 927,586 | 2,183,805 | 1,256,219 |
| Total | $4,356,454 | $8,108,394 | $3,751,940 |

## Books and Records

The record herein does not adequately reflect how, at the time cash sales receipts were received by the various restaurants, the cash receipts were recorded, if at all, on the books and records of Peoplefeeders, of Square Pan, and of the other related corporate entities. The evidence does not indicate that, at the time cash receipts were received by the restaurants, debit entries were made to a cash bookkeeping account, nor that credit entries were made to a sales account.

The record, however, does establish that when cash receipts were transferred from the separate bank accounts of the restaurants into the Intercompany bank account, entries were made, apparently for the first time, in the books and records of Peoplefeeders, of Square Pan, and of the other corporate subsidiaries. Again, however, the parties' briefs and the limited portions of petitioner's books and records that were introduced into evidence herein are confusing, incomplete, and unclear as to specifically how the transfers of cash into, and the payment of expenses out of, the Intercompany bank account

were reflected on the books and records of Peoplefeeders, of Square Pan, and of the other related entities.

We describe below our understanding and findings, based on incomplete and confusing evidence, of the bookkeeping entries of Peoplefeeders and Square Pan relating to the transfer of cash receipts into and the payment of expenses and loan payments out of the Intercompany bank account.

Cash receipts transferred from Peoplefeeders into the Intercompany bank account were recorded as debits (or as increases in cash) in favor of Peoplefeeders in what was referred to as Peoplefeeders' Intercompany general ledger bookkeeping account No. 1457000 (Peoplefeeders' Intercompany general ledger account) and as credits to what was referred to as Square Pan's Intercompany general ledger account No. 1457000 (Square Pan's Intercompany general ledger account).

Payments out of the Intercompany bank account of Peoplefeeders' business expenses and of Peoplefeeders' loan payments to Motsenbocker and to Commerce Bank were recorded as credits to Peoplefeeders' Intercompany general ledger account and apparently as debits to Square Pan's Intercompany general ledger account.

Payments out of the Intercompany bank account of Peoplefeeders' expenses and loan payments were never treated or specifically labeled in Peoplefeeders' or in Square Pan's books and records as a loan from Square Pan, and the cash receipts

transferred into the Intercompany bank account from Peoplefeeders were never treated or specifically labeled in Peoplefeeders' or in Square Pan's books and records as repayments of a loan from Square Pan.

Also, as discussed further below, not until 1992 was the difference between the total of the cash receipts transferred by Peoplefeeders into the Intercompany bank account and the total of the expenses and loan payments paid on behalf of Peoplefeeders out of the Intercompany bank account treated in the minutes of Peoplefeeders' board of directors meetings as a loan to Peoplefeeders. That difference was never reflected by a written promissory note from Peoplefeeders in favor of Square Pan. No interest was ever charged to Peoplefeeders with regard to that difference. That difference was never treated or specifically labeled in Peoplefeeders' or in Square Pan's Intercompany general ledger accounts as a loan or as a discrete credit balance.

Private Placement Memorandum, 1991 Sale of Restaurants, and 1992 Board of Directors' Meeting

In 1988, Partrick attempted unsuccessfully to sell the stock in Peoplefeeders through a private placement. In the related private placement memorandum, no indication or disclosure was made of any debt or loan obligation owed by Peoplefeeders to Square Pan or to the other related entities.

Over the course of 1987 through 1991, the majority of the Square Pan Pizza restaurants was either sold or closed. In

November of 1991, the remaining Square Pan Pizza restaurants were sold to Sbarro, Inc. (Sbarro), an unrelated entity.  The sale of these restaurants to Sbarro resulted in a taxable gain to Square Pan of $1,417,271.

At the time of the sale to Sbarro, Partrick discussed the $1,417,271 taxable gain with representatives of Arthur Andersen & Co., who informed Partrick that deductions could be generated that would offset the $1,417,271 taxable gain.

On May 4, 1992, at a special meeting of the board of directors of Square Pan, the directors adopted a resolution that purported to treat the $3,751,940 difference between Peoplefeeders' total cash receipts and Peoplefeeders' expenses and loan payments that had been paid out of the Intercompany bank account as a $3,751,930 debt obligation of Peoplefeeders to Square Pan and that purported to cancel that debt obligation as uncollectible.[2]

In the resolution adopted by the board of directors, the stated reason for the cancellation of the purported $3,751,930 debt obligation was that no repayments had ever been made by Peoplefeeders on the purported debt obligation and that due to the financial condition of Peoplefeeders there existed no prospect of collecting any part of the debt obligation.

-----

[2]    The $10 discrepancy between the $3,751,940 difference and the $3,751,930 purported bad debt obligation is not explained in the record.  Hereinafter, we refer only to $3,751,930.

In December of 1992, Partrick made a loan to Peoplefeeders of approximately $600,000 with an interest rate of 4 percent over prime. The principal amount of this loan was payable on demand. This loan from Partrick to Peoplefeeders was approved in advance by a resolution of Peoplefeeders' board of directors, evidenced by a promissory note, and secured by Peoplefeeders' assets.

Petitioner's Income Tax Returns and Respondent's Audit

For each of its taxable years, Peoplefeeders, Square Pan, and Square Pan's subsidiaries filed consolidated corporate Federal income tax returns. On petitioner's 1992 consolidated corporate Federal income tax return, the $3,751,930 difference between Peoplefeeders' total cash receipts and the total expenses and loan payments paid out of the Intercompany bank account on behalf of Peoplefeeders was reflected on the balance sheet attached to the 1992 tax return as an intercompany receivable but also as an adjustment or a reduction to Peoplefeeders' equity investment in its subsidiaries.

On petitioner's 1992 consolidated corporate Federal income tax return, Square Pan claimed a $3,751,930 bad debt deduction relating to the alleged cancellation of the purported $3,751,930 debt obligation owed by Peoplefeeders to Square Pan.[3] On its

---

[3] For 1992, under sec. 1.1502-14(d), Income Tax Regs., bad debt deductions were allowed upon cancellation of worthless debt obligations between affiliated corporate entities even though such entities filed consolidated Federal corporate income tax returns. This regulation was generally effective for bad debt

(continued...)

1990 and 1991 consolidated corporate Federal income tax returns, petitioner claimed NOL carrybacks, and on its 1993 and 1994 consolidated corporate Federal income tax returns petitioner claimed NOL carryforwards relating to the $3,751,930 bad debt deduction claimed on the 1992 consolidated corporate Federal income tax return.

Also, on the 1992 consolidated corporate Federal income tax return, relying on the insolvency exception of section 108(a)(1)(B) and Peoplefeeders' alleged insolvency, Peoplefeeders did not recognize any income relating to the cancellation of the purported $3,751,930 debt obligation to Square Pan. Further, on the 1992 consolidated corporate Federal income tax return, Peoplefeeders took the position that, under section 108(b), no reduction in any tax attributes (specifically no reduction in the amount of the NOL that was claimed on the tax return relating to the claimed $3,751,930 bad debt deduction) was required on petitioner's tax return because the claimed bad debt deduction and the related NOL did not "belong to" Peoplefeeders (i.e., on the ground that the claimed bad debt deduction and the related NOL constituted tax attributes not of Peoplefeeders, but only of Square Pan).

---

[3](...continued)
deductions claimed prior to July 12, 1995, and was removed for later years by amendments to the regulations as reflected in T.D. 8597, 1995-2 C.B. 147.

Because petitioner under section 441 elected a "52-53 week" taxable year, petitioner's consolidated corporate Federal income tax returns for each of 1990 through 1994 accurately reflected petitioner's taxable years beginning and ending on different dates in late June and July (i.e., on the Sunday nearest the last day of June of each year).

However, as set forth below, on the protest letter that petitioner mailed to respondent, on the petition that petitioner mailed to the Court, and on the 30-day letters and on the notice of deficiency that respondent mailed to petitioner, the dates for the ending of petitioner's 1990 through 1994 taxable years were indicated as June 30 of each year.  The actual last day of each of petitioner's taxable years as reflected on petitioner's tax returns for each year is also set forth in the schedule below:

| Taxable Year | Yearend Date Indicated On Petitioner's | | | Respondent's | |
| | Tax Return | Protest Letter | Petition | 30-Day Letter | Notice Of Deficiency |
|---|---|---|---|---|---|
| 1990 | July 1 | June 30 | June 30 | June 30 | June 30 |
| 1991 | June 30 | June 30 | June 30 | June 30 | June 30 |
| 1992 | June 28 | June 30 | June 30 | June 30 | June 30 |
| 1993 | June 27 | June 30 | June 30 | June 30 | June 30 |
| 1994 | July 3 | June 30 | June 30 | June 30 | June 30 |

On audit of petitioner's 1992 taxable year, respondent disallowed petitioner's $3,751,930 claimed bad debt deduction and the related claimed NOL carryback and carryforwards to 1990, 1991, 1993, and 1994.  On September 12, 1997, with the trial herein scheduled for October 27, 1997, petitioner, in a motion to

dismiss for lack of jurisdiction, raised the issue that respondent's notice of deficiency incorrectly indicated ending dates for petitioner's taxable years, that the notice of deficiency therefore was invalid, and that the Court lacks jurisdiction over petitioner's actual 1990 through 1994 taxable years.

In making the above adjustments to petitioner's consolidated income and expenses for each year, respondent did not make any adjustment, and respondent did not charge petitioner with any item of income or adjust any expense item relating to the 2 or 4 days that were reflected in the notice of deficiency and that were not part of petitioner's 1990 through 1994 taxable years.

During respondent's audit of petitioner's 1990 through 1994 consolidated corporate Federal income tax returns, the accounting firm of Arthur Andersen represented petitioner.  Petitioner's representatives from Arthur Andersen met with respondent, discussed legal and factual issues, and later prepared and filed the protest and the petition.

OPINION

Validity of Notice of Deficiency

Litigation in this Court requires as a jurisdictional prerequisite a valid notice of deficiency.  Sec. 6213(a).  The notice must indicate the taxable period involved or provide sufficient information that the taxpayer reasonably could not be misled as to the taxable period involved.  Commissioner v. Forest

Glen Creamery Co., 98 F.2d 968, 971 (7th Cir. 1938), revg. and remanding 33 B.T.A. 564 (1935); Smith v. Commissioner, T.C. Memo. 1979-16.

Petitioner argues that because respondent's notice of deficiency indicates that tax deficiencies were determined against petitioner for taxable years ending on June 30 of each year, when in fact petitioner's taxable years ended on dates other than June 30, respondent's deficiency determinations should be regarded as invalid.  Further, petitioner argues that because respondent never determined tax deficiencies for petitioner's correct 1990 through 1994 taxable years, the Court has no jurisdiction over any of such taxable years.[4]

Respondent argues that the notice of deficiency at issue in this case was sufficiently accurate, did not mislead petitioner, and adequately informed petitioner that the tax deficiencies reflected therein related to petitioner's 1990 through 1994 taxable years.

We agree with respondent.

The June 30 date indicated in respondent's notice of deficiency for the end of each of petitioner's 1990 through 1994 taxable years was an innocuous error and did not mislead petitioner in any way.  Petitioner's representatives understood

[4]    For petitioner's 1991 taxable year, which ended on June 30, petitioner's jurisdictional argument is based on the allegation that respondent's notice of deficiency for petitioner's 1991 taxable year implicitly treated petitioner's taxable year as beginning on July 1, 1990, when in fact it began on July 2, 1990.

that the references in the notice of deficiency to petitioner's taxable years ending June 30 were to petitioner's actual taxable years based on 52-to-53 week years that ended on the Sunday nearest the last day of June of each year.

On petitioner's written protest letter and petition, petitioner's representatives themselves indicated that petitioner's taxable years ended on June 30. No evidence indicates that petitioner's representatives were at any time confused or misled over what taxable years were covered by respondent's notice of deficiency. The record is clear that petitioner's representatives were not misled as to whose and which taxable years were in issue.

Not until just prior to the trial of this case in 1997 did petitioner's representatives allege that respondent's notice of deficiency did not relate to petitioner's taxable years. Any genuine lack of knowledge as to whose and which taxable years were covered by respondent's notice of deficiency would have been raised long before September 12, 1997. If petitioner's representatives genuinely believe respondent's notice of deficiency did not determine tax deficiencies for any of petitioner's taxable years, why were written protests filed on behalf of petitioner in which the only challenges raised related to the substance of the adjustments reflected in the notice of deficiency?

We also note that in making adjustments to petitioner's consolidated income and expenses, respondent, in the notice of deficiency, did not make any income, expense, or other adjustment relating to the 2 to 4 days that were reflected in respondent's notice of deficiency but that technically were not part of petitioner's taxable years.

We conclude that respondent's notice of deficiency is valid and determined deficiencies for petitioner's taxable years ending on July 1, 1990, June 30, 1991, June 28, 1992, June 27, 1993, and July 3, 1994, and that petitioner's tax liabilities for those years are properly before the Court.

Bad Debt Deduction

Under section 166(a)(1), bad debt deductions are allowed for loans that become worthless within the year.  Under section 1.166-1(c), Income Tax Regs., bad debt deductions are limited to loans that arise from genuine debtor-creditor relationships and that are based on valid and enforceable obligations to pay fixed or determinable sums of money.

Generally a transfer of funds by a corporation to its shareholders may be treated as a loan if, at the time of the transfer, the parties intended that the shareholders repay the corporation the amount of funds transferred.  Crowley v. Commissioner, 962 F.2d 1077, 1079 (1st Cir. 1992), affg. T.C. Memo. 1990-636; Wiese v. Commissioner, 93 F.2d 921 (8th Cir. 1938), affg. 35 B.T.A. 701 (1937); Miele v. Commissioner, 56 T.C.

556, 567 (1971), affd. without published opinion 474 F.2d 1338 (3d Cir. 1973).

Petitioner bears the burden of proving that the amounts in question constitute loans. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Courts typically determine whether the requisite intent to repay was present by examining objective evidence of the parties' intentions. See, e.g., Busch v. Commissioner, 728 F.2d 945, 948 (7th Cir. 1984), affg. T.C. Memo. 1983-98; Alterman Foods, Inc. v. United States, 505 F.2d 873, 877 n.7 (5th Cir. 1974).

The following list of factors is often set forth in analyzing whether transfers of funds between related corporations should be treated as loans, as equity, or as dividends: (1) Whether the transfers of funds are evidenced by written promissory notes and are otherwise reflected on the taxpayer's books and records as loans; (2) the presence or absence of stated maturity dates; (3) the source of payments; (4) the right to enforce payments of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) the identity of interest between shareholders and creditors; (10) repayments on the purported loans only out of profits; and (11) the ability of the purported debtor to obtain loans from outside lending institutions. Hardman v. United States, 827 F.2d 1409, 1411-1412 (9th Cir.

1987); Bauer v. Commissioner, 748 F.2d 1365, 1368 (9th Cir. 1984), revg. T.C. Memo. 1983-120; A.R. Lantz Co. v. United States, 424 F.2d 1330, 1333 (9th Cir. 1970); O.H. Kruse Grain & Milling v. Commissioner, 279 F.2d 123, 125-126 (9th Cir. 1960), affg. T.C. Memo. 1959-110.

Because the control element suggests the opportunity to contrive a fictional debt, transfers of funds between related corporations are subject to particular scrutiny. In re Uneco, Inc., 532 F.2d 1204, 1207 (8th Cir. 1976). Transfers of funds between closely held corporations and shareholders are often characterized by informality, but in order to qualify for loan treatment in such situations the transfer of large amounts of funds generally should have some formal indicia of a loan. Lewis v. Commissioner, T.C. Memo. 1985-563.

Where transfers of funds were made from a subsidiary corporation to a parent corporation through a centralized accounting system and where customary indicia of loans were not present, the transfers were treated as constructive dividends and not as loans. Alterman Foods, Inc. v. United States, supra.

Petitioner argues that the shareholders of Peoplefeeders intended for Peoplefeeders to repay Square Pan the $3,751,930 difference between Peoplefeeders' total cash receipts transferred into the Intercompany bank account and the total expenses and loan payments paid on behalf of Peoplefeeders out of the Intercompany bank account and that the use of funds in the

Intercompany bank account to pay Peoplefeeders' expenses and loan payments should give rise to bona fide debt treatment of the claimed $3,751,930.

Petitioner further argues that during its 1992 taxable year, the purported $3,751,930 debt obligation owed by Peoplefeeders to Square Pan became worthless, that for the year in issue bad debts between members of consolidated groups of taxpayers were deductible, and that petitioner is entitled to a bad debt deduction of $3,751,930 for its 1992 taxable year.

Respondent argues that the payments out of the Intercompany bank account of Peoplefeeders' expenses and loan payments did not have associated with them typical indicia of loans, and that the evidence does not establish that it was intended for Peoplefeeders to repay Square Pan any difference between cash receipts transferred into the Intercompany bank account on behalf of Peoplefeeders and expenses and loan payments paid out of the Intercompany bank account on behalf of Peoplefeeders. Respondent would treat that difference not as a genuine debt obligation of Peoplefeeders to Square Pan but as a constructive dividend from Square Pan to Peoplefeeders.

The purported $3,751,930 debt obligation of Peoplefeeders to Square Pan was not evidenced by promissory notes or security agreements. No maturity dates, interest, repayment terms, or repayment amounts were agreed to. The transfers of cash receipts from Peoplefeeders to the Intercompany bank account were not

regarded or treated as "repayments" of any debt obligation, but rather simply as a process of placing all of the cash receipts of each of petitioner's related restaurants and corporate entities into a single cash pot for purposes of cash management, credit enhancement, and payment of bills. Such transfers into the account were contingent on the amount of cash receipts received from sales, a feature not typically associated with the payment of genuine debt obligations.

In its brief, petitioner refers to the "ebb and flow" of funds into and out of the Intercompany bank account. Such "ebb and flow" in the transfer of cash between petitioner's related entities reflected the mere management of funds and cash-flow and an apparently efficient way for Peoplefeeders to move funds between itself and related entities, not the establishment of genuine debt obligations.

Because of the absence of fixed maturity dates and repayment terms associated with the payment out of the Intercompany bank account of Peoplefeeders' expenses and loan payments, Square Pan had no means of establishing Peoplefeeders' default and no basis for seeking to enforce repayment of alleged debt principal or payment of interest.

The evidence does not indicate that Square Pan ever requested repayment from Peoplefeeders of the purported $3,751,930 debt obligation, and in the minutes of Square Pan's

May 4, 1992, board of directors' meeting, it is represented that no repayment was ever made on this purported debt obligation.

The lack of a written promissory note, of collateral, of security, of repayment terms, and of interest, among other things, indicates that Peoplefeeders and its officers and shareholders never intended for Peoplefeeders to have a fixed repayment obligation to Square Pan or to the other related subsidiaries of the $3,751,930 difference between cash receipts transferred into the Intercompany bank account on behalf of Peoplefeeders and expenses and loan payments paid out of the Intercompany bank account on behalf of Peoplefeeders.

Square Pan's identity as a wholly owned subsidiary of Peoplefeeders indicates that the relationship between the two entities with regard to the $3,751,930 difference did not constitute that of a creditor/debtor, but rather that it constituted that of a subsidiary/parent, and that the $3,751,930 should not be treated as a bona fide debt obligation.

Between 1987 and 1992, with the operating assets of Square Pan already secured in favor of the Motsenbocker and Commerce Bank loans and with the failure in 1988 to raise funds through a private placement memorandum, Peoplefeeders was not in a position to repay the difference in funds paid out on its behalf from the Intercompany bank account.

The significant relevant factors indicate that the $3,751,930 in question should not be treated as a genuine debt

obligation of Peoplefeeders.  Petitioner is not entitled to the claimed $3,751,930 bad debt deduction and the related NOL carrybacks and carryforwards.

We note that respondent makes two alternative arguments -- one factual and the other legal.  Respondent's alternative factual argument is that if the $3,751,930 is to be regarded as a genuine debt obligation of Peoplefeeders to Square Pan, as petitioner contends, in May of 1992 the full $3,751,930 principal amount of that debt obligation would constitute a loan receivable on the books of Square Pan and the value of the stock in Square Pan that Peoplefeeders owned would reflect that $3,751,930 receivable, making Peoplefeeders no longer insolvent, and requiring Peoplefeeders, under sections 61(a)(12) and 108(a), to recognize $3,751,930 in discharge of indebtedness income.

Respondent's alternative legal argument is that if the $3,751,930 is to be regarded as a genuine debt obligation of Peoplefeeders to Square Pan, if Peoplefeeders is to be regarded as insolvent, and if, under the insolvency exception of section 108(a)(1)(B), Peoplefeeders is to be allowed to exclude from income the $3,751,930 discharge of indebtedness income, petitioner's consolidated group of taxpayers filing the 1992 corporate Federal income tax return would be required under section 108(b) to reduce appropriate tax attributes (specifically the amount of the NOL produced by the $3,751,930 bad debt deduction) by the $3,751,930 amount of the excluded discharge of

indebtedness income.  Because of our holding on the threshold issue, we need not decide respondent's alternative arguments.

To reflect the foregoing,

<u>An appropriate order will be issued, and decision will be entered under Rule 155</u>.