ESTATE OF RALPH F. SELL, JR. and PATRICIA M. SELL, Petitioners v. COMISSIONER OF INTERNAL REVENUE, Respondent [1]
Sell v. Commissioner
Docket No. 21566-89
United States Tax Court
T.C. Memo 1992-430; 1992 Tax Ct. Memo LEXIS 455; 64 T.C.M. (CCH) 304; July 29, 1992, Filed *455 Decision will be entered under Rule 155. For Petitioners: Robert G. Nath, John P. Dedon, Dexter S. Odin, and James B. Pittleman. For Respondent: Kristine A. Roth. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to the tax as follows: Additions to Tax
Year
Deficiency
Sec.6651
Sec.6653(a) or (a)(1)
Sec.6661
1979
$ 92,220
--   $ 4,747
--   1980
327,657
$ 20,231
20,819
--   1981
73,910
--   [1] 3,738
--   1982
63,812
--   [1] 3,302
$ 16,510
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues remaining for decision are: 1. Whether certain withdrawals made by petitioner Ralph F. Sell, Jr., from his family-controlled corporation, *456 Sell & Co., Inc., constituted loans or constructive dividends; 2. Whether petitioner Patricia M. Sell is an innocent spouse within the meaning of section 6013(e); 3. Whether petitioners are liable for the addition to tax under section 6651(a)(1) for the late filing of their Federal income tax return for 1980; 4. Whether petitioners are liable for additions to tax under section 6653(a) or (a)(1) and (2) for negligence or disregard of rules or regulations for the various years at issue; and 5. Whether petitioners are liable for the addition to tax under section 6661 for substantial understatement of income tax for 1982. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioners Ralph F. Sell, Jr., and Patricia M. Sell, husband and wife, resided in Cumberland, Maryland, at the time they filed their petition. The term petitioner in the singular will hereinafter refer to Ralph F. Sell, Jr. Joint Federal income tax returns were executed by petitioners and filed with the Internal Revenue Service after the due dates, as extended, as follows: Year
Due Date As Extended
Filing Date
1979
9/15/80
7/07/81
1980
11/16/81
12/28/81
1981
9/20/82
10/18/82
1982
11/02/83
12/23/83
*457 Amended returns for 1979 and 1981 were filed on November 26, 1982. An amended return for 1980 was filed on July 19, 1982. Background
Sell & Co., Inc. (the Corporation) was engaged in business as a wholesale food distributor, with its principal place of business in Cumberland, Maryland. As part of its food distribution business, the Corporation operated a wholly owned subsidiary, T&W Sales, Inc., in Elkins, West Virginia. Petitioner's father, Ralph F. Sell, Sr., started the business in the early 1930s and incorporated the business in the late 1950s. Even as a young boy, petitioner had worked with his father in the business. After marrying petitioner Patricia M. Sell (Mrs. Sell) and serving a tour of duty in the Coast Guard, petitioner returned to work for his father in various positions at the Corporation. The senior Mr. Sell died in 1972 of a heart attack. At that time petitioner, his sister, Phyllis MacVeigh, and their mother, Regina Y. Sell, met to decide the future of the Corporation. Neither Patricia M. Sell, petitioner's wife, nor John MacVeigh, Phyllis' husband, was invited to attend this family meeting. At that meeting, the Sell family decided that petitioner *458 would become president of the Corporation, Phyllis MacVeigh would become treasurer, John MacVeigh would become vice president, and Patricia M. Sell would become secretary. It was also decided that petitioner's mother, Regina Y. Sell, would serve as chairman of the board. Petitioner, Patricia M. Sell, Phyllis MacVeigh, and John MacVeigh at some point acquired all of the outstanding stock of Sell & Co., Inc. They owned all of the stock, held all of the corporate offices, and were the sole members of its board of directors at all times relevant to this case. Specifically, in the years 1979 through 1982, the stockholders and officers of the Corporation were as follows: Name
Percentage of Stock Owned
Office
Ralph F. Sell, Jr.
42.67
President
Phyllis MacVeigh
42.67
Treasurer
John MacVeigh
7.33
Vice President
Patricia M. Sell
7.33
Secretary
Petitioner's Withdrawals From and Payments To the Corporation
During the years at issue, in addition to his salary as the corporate president, petitioner regularly withdrew corporate funds for his personal or family use. Such a practice had been commenced by the senior Mr. Sell at the inception of the business in 1931 and *459 apparently continued after the business was incorporated. [2] Amounts withdrawn by petitioner were recorded as loans on the Corporation's tax returns and on its financial statements. The board of directors did not authorize any loans to or withdrawal of funds by petitioner, and the other officers and directors were unaware of the fact that petitioner was withdrawing these funds. Petitioner did not execute promissory notes evidencing his indebtedness, nor did he pledge any security for the advances. There were no specified repayment dates, and petitioner did not sign any documents committing himself to specific repayment dates or payment of any interest. The "loans" were not in proportion to petitioner's stock ownership, since none of the other stockholders received such "loans". *460 Petitioner made some repayments to the Corporation, which were recorded as credits on his ledger cards, as will be described more fully below. After such credits, petitioner's net withdrawals from the Corporation for the years before the Court were as follows: 1979
$  27,649.28
1980
384,206.44
1981
114,127.41
1982
59,763.46
The various items and transactions comprising these net withdrawals will also be discussed more fully below. The above amounts were not reported as income on petitioners' tax returns for those years. The MacVeighs Learn of the Withdrawals and Demand Restitution to the Corporation
In 1981 and 1982, the Corporation began to experience problems with suppliers not shipping goods on time and claiming that they were not being paid on time. In 1982, two employees of the Corporation confidentially advised John MacVeigh to look into the Corporation's bank accounts. Upon looking into the bank accounts for the Corporation and its subsidiary, Mr. MacVeigh found that a number of checks listed on the bank statements were missing. He also discovered that checks had been written to suppliers that had not supplied goods to the Corporation. Up to that *461 point, Mr. MacVeigh had never been furnished any copies of the Corporation's tax returns or financial statements. After keeping watch over the checking accounts for 3 or 4 months, Mr. MacVeigh and his attorney, William Walsh, met with Mr. Reinecke, one of the Corporation's accountants, to discuss these matters. At that time, Mr. MacVeigh asked Mr. Huber, another member of that accounting firm, to prepare an analysis of petitioner's various withdrawals from and payments to the Corporation. Mr. Huber relied upon various ledger cards for petitioner in preparing this analysis, and he reported his findings to the MacVeighs. Mr. Huber reported that petitioner had made net withdrawals totaling $ 524,570 over the 4-year period from 1979 through December 31, 1982. Thereafter, there were a number of conferences attended by the Corporation's accountants, the MacVeighs and their attorney, petitioners, Ellen Sell Torrington (petitioners' daughter), Christopher Sell (petitioners' son), and petitioners' attorney. The purpose of those various meetings was to decide how much money petitioner should repay to the Corporation. In October 1983, the MacVeighs' attorney sent a letter to petitioners' *462 attorney, stating that the MacVeighs "insist that arrangements be made at once for a satisfactory repayment [by petitioner] of the obligations due to the [Corporation]". In January of 1984, Phyllis MacVeigh contacted Ellen Sell Torrington to arrange a meeting in Mr. Huber's offices to discuss some of the business practices occurring at the Corporation. Petitioner refused to attend this meeting, but Mrs. Sell did attend. At this meeting Mrs. Sell, for the first time, learned of her husband's withdrawals of funds from the Corporation. During these meetings and subsequent ones in 1985 and 1986, the MacVeighs finally became aware of the extent of the Corporation's financial problems and the extent of petitioner's withdrawals of funds from the Corporation for his personal use. It had been the MacVeighs' understanding that there was an agreement to split everything in the Corporation evenly between the two families. The MacVeighs had not withdrawn any funds, other than salary, from the Corporation. On August 13, 1986, petitioners and the MacVeighs entered into a restitution agreement, executed as of January 5, 1985, in which petitioners obligated themselves to repay to the Corporation *463 the principal sum of $ 725,000, the agreed-upon amount of their indebtedness to the Corporation as of December 31, 1984, plus interest thereon. Petitioners secured this obligation with a pledge of their corporate stock. The agreement established a repayment schedule, with a final payment being due on or before December 31, 1990. In 1990, petitioners surrendered their stock, valued at $ 453,000, in partial payment of this contractual obligation. The record does not establish the total amount actually paid by petitioners pursuant to this agreement, or when those payments were made. Bookkeeping System and Its Impact on Filing Tax Returns
Rather than formal accounting books and records, the Corporation and T&W Sales, Inc., used a ledger card system. Separate ledger cards were used to record each company's assets, liabilities, equity, revenues, and expenditures, white cards for the Corporation at Cumberland, Maryland, and yellow cards for the subsidiary at Elkins, West Virginia. Two groups of ledger cards were kept for each company, the first group prepared contemporaneously by the Corporation and the second group prepared later by its accounting firm after the end of the *464 tax year. The first group of cards were daily ledger cards. James Richards (the Corporation's office manager, credit manager, and comptroller) or someone under his supervision would post daily transactions on the daily ledger cards for both the Cumberland and the Elkins operations. The second group of ledger cards consisted of summary ledger cards to which entries from the daily cards were transferred after the end of the year by the Corporation's outside accounting firm, McLaughlin, Reinecke & Associates (McLaughlin, Huber & Company after 1983). Both sets of ledger cards for each corporation were kept in a tray in the Corporation's office or safe in Cumberland, Maryland. Anyone in the office had access to the cards during business hours. Entries on the ledger cards were made on a Sensamatic machine. This machine would date stamp the card along with the amount to be credited (payment to Corporation) or debited (amount owed to Corporation). Every time the machine was used, the date had to be manually reset. Some of the entries on the ledger cards (both daily and summary cards) were out of date sequence. Each day, Mr. Richards, or someone under his supervision, would tabulate *465 by adding machine all incoming payments and checks from customers and other deposits to be made into the Corporation's bank accounts. Daily expenses and purchases were also totaled, and all of these amounts were posted to their respective daily ledger cards. Separate ledger cards (summary and daily cards) were maintained to record petitioner's withdrawals from and payments to the Corporation. Petitioner would usually write corporate checks for any large amounts of money he withdrew from the Corporation. Mr. Richards would post these amounts to petitioner's daily ledger cards when the cancelled checks returned from the bank. Petitioner also withdrew cash from the Corporation. If petitioner orally informed Mr. Richards of a cash withdrawal or if petitioner filled out a "sales ticket" or "chit" for an amount of cash withdrawn, Mr. Richards would then make an entry on petitioner's daily ledger cards for these amounts. Petitioner also made some repayments to the Corporation, which were recorded as credits on his ledger cards. Mr. Richards was aware that petitioner made some large deposits into the Corporation's bank accounts, but he did not know the source of that money. Mr. Richards *466 recorded all of the transactions that petitioner directed him to record. In addition, during the accountants' yearend review, some expense or withdrawal items that could not be accounted for by the other expense accounts were added to petitioner's summary ledger cards as withdrawals made by petitioner. Petitioner did not disagree with these adjustments made by the Corporation's accountants. However, the record does not establish either the number of instances or the amounts, if any, of any such figures added to petitioner's summary ledger cards for the years before the Court. The Corporation's accountants advised petitioner year after year to replace the ledger card system. The system was adequate to record receipts and disbursements; however, because the system was a single entry system, bookkeeping errors arose that could not be detected on a daily basis. Only during the accountants' end-of-the-year review were the accountants able to detect errors and balance the ledger cards. The Corporation had utilized this ledger card system since at least the 1960s. Mr. Richards, who began to work for the Corporation in 1950 and became office manager in 1959, maintained the daily ledger *467 card system during the years at issue. He would occasionally contact the Corporation's accountants during the year to ask questions or to determine how to handle particular transactions. However, the accounting firm did not make entries on the daily ledger cards or otherwise provide regular accounting services during the year. Principally, the accounting firm prepared tax returns, financial statements, and the summary ledger cards. The accountants used the daily and summary ledger cards during the years in question to prepare the Corporation's income tax returns. The accountants also prepared petitioners' individual returns and relied on petitioner for the necessary information. After the end of the year, Mr. Huber or other members of the accounting firm would meet with Mr. Richards and then prepare a summary of the daily ledger cards. Often, the daily ledger cards were not in balance. The accountants would attempt to resolve these differences. However, at times, the accountants would make charges (debits) to petitioner's ledger card account in order to balance the ledger cards, i.e., "plug in" a figure to bring the ledger cards into balance. The accountants repeatedly advised *468 petitioner to change the Corporation's system, which system caused delay in preparation of the corporate tax returns and petitioners' individual tax returns. Both the corporate and individual returns were routinely filed late, beyond the respective due dates as extended. Petitioner took no action to change the Corporation's ledger card system. Mrs. Sell's Limited Role in the Corporation
Petitioner and Mrs. Sell were married in September of 1952. Mrs. Sell had been born and reared in Cumberland, Maryland. She had a strict upbringing by her paternal grandmother. Upon graduating from high school, Mrs. Sell desired to go to college, but her family could not afford to send her. She was given a choice between attending a local college to become a teacher or entering nurses' training. Mrs. Sell chose nursing and graduated from the Memorial Hospital School of Nursing in June of 1952. Throughout the course of her education, Mrs. Sell did not have any courses in tax matters, business, or accounting, nor had she done well in mathematics. Soon after their marriage, the couple lived in St. Louis, Missouri, while petitioner was still in the Coast Guard. Although her husband did *469 not want her to work, Mrs. Sell worked at Barnes General Hospital during this time to make use of her training. Then, expecting their first child, Mrs. Sell stopped working, moved back to Cumberland in April of 1953, and awaited her husband's discharge from the Coast Guard, scheduled for the fall of 1953. Their first child, Ellen, was born in Cumberland in August of 1953. At that time, Mrs. Sell became a full-time wife, mother, and homemaker. Petitioner joined his father at the Corporation upon his discharge from the Coast Guard. Petitioners have four children: Ellen; Ralph Gregory (Greg), who was born in 1955; Christopher, who was born in 1958; and Virginia Anne, who was born in 1968. During the years at issue, the Corporation was run primarily by petitioner. Mrs. Sell's corporate duties were limited to signing, in her capacity as secretary, a few corporate documents when requested to do so. She did not review the Corporation's checkbooks or financial records nor discuss corporate finances with her husband or the Corporation's accountants. She did not attend annual meetings or prepare corporate documents. She did not sign corporate checks or read any of the Corporation's *470 mail. In fact, she did not have any access to corporate mail. Mrs. Sell was not consulted about nor advised on the business of the Corporation during any of the years at issue. At most, she visited the Corporation a few times over the course of many years and signed previously prepared and typed corporate minutes given to her by her husband. On occasion, she was asked by her husband to contact Phyllis MacVeigh in order to obtain her signature on the corporate minutes as well. During this time, Mrs. Sell did not deal with corporate customers, and she did very little company entertaining. Mrs. Sell occasionally accompanied her husband on business trips, but her primary occupation was homemaker, wife, and mother. Whenever Mrs. Sell broached with her husband the subject of her working, petitioner would inform her that "Sell women don't work", and that her job was to take care of the children and the home and to be active in the community. Early in their marriage, petitioner gave Mrs. Sell her own personal checking account as a Christmas gift since he found that she was forgetting to balance their joint checking account. Over the years, she would deposit the relatively steady *471 and modest allowance of money, commensurate with petitioner's salary at the time, that petitioner would give her for food and incidental household expenses. During 1979 through 1982, petitioner gave Mrs. Sell approximately $ 200 a week to cover food, shoes, dancing lessons for the children, school lunches, and the like. Throughout their marriage, petitioner paid all of the major household expenses, such as the mortgage, utilities, car insurance, and the like, from a separate bank account to which Mrs. Sell had no access. During the years at issue, Mrs. Sell's lifestyle did not change significantly. She did not receive extravagant furs or jewelry during this time. She drove a 1976 model car. The family home, lake cottage, and furnishings had been bought or received as wedding gifts many years before those at issue. Mrs. Sell redecorated the family home in 1980 or 1981 after being told by her husband that he would be receiving a bonus from the Corporation that year. After asking how much she thought she would need, petitioner suggested a figure of $ 10,000 to $ 15,000, and told Mrs. Sell to have the bills sent directly to him. That is what she did. Mrs. Sell was not aware of *472 petitioner's withdrawals from the Corporation until the January 1984 meeting requested by the MacVeighs. She was shocked to learn of these withdrawals and shocked to learn that various assets were titled in their individual names. Prior to that time, she had regarded the airplane as a corporate asset for business use. She took only a few trips in the airplane, totaling 10 hours or less. She also had viewed the Red House and the mobile home as corporate assets and had made no personal use of them. [3] Mrs. Sell was given a company gasoline credit card, as were the MacVeighs and Greg. She did charge gasoline to the account of the Corporation. Although she had received some minor funds and services from the Corporation, Mrs. Sell did not benefit significantly from her husband's withdrawal of funds from the Corporation. She did not receive anything beyond what would be considered normal support for a spouse in their circumstances in their community. *473 Petitioner's Alcoholism and Mrs. Sell's Power of Attorney
In 1979, petitioner's mother passed away after a long illness. Petitioner was devastated by this loss and began to drink very heavily. In the summer of 1980, while family members were staying at their lake cottage, petitioner collapsed and was rushed to the hospital. He was diagnosed as suffering from alcohol withdrawal and delirium tremens. Initially, petitioner was not expected to survive. This collapse was the first indication the family had of petitioner's illness. Petitioner began therapy, and Mrs. Sell and the children attended family and individual counseling sessions. On July 28, 1980, due to his precarious health condition, petitioner executed a general power of attorney-in-fact in favor of his wife and his elder son, Greg Sell. Mrs. Sell had been advised by counsel that she should obtain this power of attorney in order to be able to handle her personal affairs should her husband not survive, and that Greg should have a power of attorney in order to manage the Corporation. Petitioner's drinking problems grew worse. He was arrested several times for driving under the influence, appeared at a number *474 of court hearings, was given a number of 30-day suspended sentences, and was fined several hundred dollars. However, at one such hearing, a judge advised petitioner to seek professional help or risk going to jail. Petitioner enrolled in a program at Saint Luke's Hospital in Phoenix, Arizona. Mrs. Sell and son Christopher also went to Arizona for counseling. Mrs. Sell could not afford to take the entire family to Arizona because she paid for this trip and the counseling sessions from her own household funds. Although petitioner's drinking did taper off for a period after this counseling, petitioner once again began to drink excessively in December of 1981. Petitioner ultimately did serve jail time for a driving-under-the-influence offense. Petitioner's alcohol problems continued up through the time of the trial of this case. Petitioner died several months after the trial. In 1984, petitioner decided to take a 10-day cruise through the Panama Canal. His family tried to dissuade him from making the trip, but petitioner insisted upon going to Panama. As feared by his family, petitioner did not return aboard his scheduled airline flight. A distraught Mrs. Sell contacted an *475 attorney friend to seek help in locating Mr. Sell. This attorney contacted the airlines, the cruise line, and the American embassy in Panama. He also suggested to Mrs. Sell that, in order to protect herself then and in the future, she should transfer the family home and the lake cottage into a trust with someone in whom she had confidence. Mrs. Sell arranged to transfer the property to her daughter, Ellen Sell Torrington, as trustee. Also, around this time in 1984, when Mrs. Sell learned that the Red House and the mobile home were titled in her and her husband's names, she transferred the titles to those properties to the Corporation under the power of attorney she had received from her husband during his illness. She had always viewed those assets as company property, not personal, and, with the advice of counsel, arranged for the transfers. Those transfers were wholly unrelated to the fact that the Internal Revenue Service was by then examining the Corporation's returns as well as petitioners' individual returns. During petitioner's periods of incapacity, Greg Sell and John MacVeigh ran the Corporation. Greg Sell has a bachelor's degree in business and accounting, and John *476 MacVeigh has a bachelor's degree in marketing. Greg advised his mother not to worry about the business, that everything was fine, and that she should concentrate on helping his father recover. During this time, Greg Sell also began taking care of Mrs. Sell's household bills and financial matters just as petitioner had done before. Mrs. Sell did not question the handling of these matters because she had total confidence in Greg and in John MacVeigh. Items and Transactions: Petitioner's Net Withdrawals from the Corporation
For the years at issue, respondent's statutory notice of deficiency increased petitioners' taxable income by the amounts of $ 154,773 for 1979, $ 473,553 for 1980, $ 131,436 for 1981, and $ 136,544 for 1982. 1. 1979 Items and Transactions
The adjustments to petitioners' 1979 taxable income totaled exactly $ 154,772.88, for unexplained income and constructive dividends. In 1979, petitioner had "unexplained income" composed of a number of items deposited into petitioner's checking and savings accounts, totaling $ 18,336.88. The Corporation paid that amount to petitioner, and petitioner did not report it as income for 1979.
On June 29, 1979, a parcel *477 of real estate was purchased from Allen E. Bridges, Jr., for $ 29,112.40. The purchase price was paid with two checks from a bank account maintained by the Corporation at the First National Bank & Trust Co. of Western Maryland, in the amounts of $ 500 and $ 28,612.40. Title to this property was placed in the name of Greg Sell, petitioner's older son. On October 19, 1979, a second parcel of property, located on Braddock Road in Cumberland, Maryland, was purchased in the name of Greg Sell. The Corporation made two payments, in the amounts of $ 1,000 and $ 57,000, for the property from its account at First National Bank & Trust Co. of Western Maryland. The Corporation did not authorize petitioner to use corporate funds to pay for these two properties purchased by or for his son. On November 29, 1979, the Corporation borrowed the sum of $ 50,000 (the demand note) from Citizens National Bank, Elkins, West Virginia. [4] On November 30, 1979, petitioner deposited $ 50,000 into the bank account of the Corporation, designating the deposit as the demand note money. On December 27, 1979, the Corporation paid $ 50,436 in satisfaction of the principal and accrued interest on the demand note. *478 Petitioner, acting for the Corporation, borrowed $ 50,000, deposited the proceeds of that loan into the Corporation's bank account the next day, and then directed the Corporation to pay off that indebtedness the next month. The record does not explain why the transaction was structured in this manner. The money borrowed from the bank under the demand note was essentially the same money used to repay the demand note, and petitioner did not receive any benefit from the $ 50,000 corporate loan or the interest paid thereon. Petitioner's ledger card shows total credits of $ 77,800 for 1979, and we find that petitioner actually paid that amount to the Corporation that year. Therefore, petitioner's net withdrawal *479 figure and other unreported income for 1979 is $ 27,649.28, computed as follows: Unreported deposits and constructive dividends:
$ 18,336.88
29,112.40
58,000.00
$ 105,449.28
Less repayments to Corporation:
77,800.00
$ 27,649.28
2. 1980 Items and Transactions
Respondent's corrected adjustments to petitioners' 1980 taxable income totaled $ 567,553.29. [5]
On April 18, 1980, petitioner and Mrs. Sell executed a deed taking title to a house on Lafayette Avenue in Cumberland, Maryland (the Red House). *480 Funds totaling $ 23,153.80 from the Corporation were used to consummate the purchase. This Red House was located next to the Corporation's warehouse and was used to store old corporate records. Sara Bussey, the seller, had refused for many years to sell the house to the Corporation but finally agreed to sell it to petitioners in their individual capacity. Petitioners never used this house for personal purposes. The Red House was deeded to the Corporation on July 17, 1984. [6] We find that the Red House was always used as a corporate asset from the date of purchase, and therefore, respondent's adjustment to petitioners' taxable income for 1980 should be reduced by the purchase price for the Red House, $ 23,153.80. *481 In 1980, petitioner purchased a mobile home for $ 24,963, all of which was paid by the Corporation. The mobile home was titled in petitioner's name. This mobile home was purchased to travel to and prepare foods for industry food exhibitions. There is no explanation in the record as to why the mobile home was titled in petitioner's name. However, the Sell family never used the mobile home for personal use, and it was usually parked at the corporate warehouse when not in use by the Corporation. The food shows occurred a couple of times a year, and Christopher Sell, his father, and the Corporation's sales manager would travel together in the mobile home to attend these shows. In 1984, upon advise of her attorney, Mrs. Sell also transferred title to the mobile home to the Corporation. She had always viewed the mobile home as a corporate asset. See supra note 6. Thus, although there is no explanation as to why title to the mobile home was initially placed in petitioner's name, we find that the mobile home was a corporate asset and that the adjustment to petitioners' taxable income should be reduced by $ 24,963. On January 16, 1980, petitioners' daughter, Ellen Sell Torrington, *482 borrowed $ 40,000 cash to use for the purchase of a home. Mrs. Torrington and her husband made mortgage payments each month to Cumberland Savings Bank for approximately 10 years. She and her husband signed a 90-day demand note "to the order of [blank] at Cumberland Savings Bank". They were under the impression that petitioner, with his close relationship with a bank officer there, had arranged for them to receive a loan from the bank. However, petitioner, in fact, withdrew $ 40,000 from the Corporation for the purchase of the home, and the Torringtons' monthly payments were actually credited to petitioners' personal account at Cumberland Savings. Petitioners' taxable income should be increased by this $ 40,000 amount. In 1980, the Corporation paid off petitioner's personal loan from Citizens National Bank. See supra note 4. Petitioners' taxable income should be increased by this amount. In February 1980, petitioner cashed a certificate of deposit owned by the Corporation in the amount of $ 66,648. Petitioners' taxable income should be increased by this amount. Also in 1980, petitioner used corporate funds totaling $ 16,810 to satisfy the Federal estate tax liability *483 of the estate of Regina Y. Sell, petitioner's mother. A refund of $ 14,316 received from the State of Maryland with respect to state inheritance taxes for the same estate was subsequently deposited into the Corporation's bank account by petitioner. Respondent has agreed that the adjustment for 1980 should be reduced by the $ 14,316 state tax refund so deposited. Petitioners' income should be increased by only $ 2,494 ($ 16,810 - $ 14,316) for this item. Prior to 1979, petitioner personally purchased a two-seat Navajo airplane, financing the purchase through Cumberland Savings Bank. He rented that airplane to Nicolson Air Service and reported the rental income on Schedule E of his returns for 1979 and 1980. The note held by the bank remained unpaid as of the beginning of 1980. In 1980, the Corporation paid the balance due on the note for the Navajo airplane in the amount of $ 35,451. In 1980, the Corporation also made loan payments of $ 19,318 on behalf of petitioner with respect to the loan secured by the Navajo. These amounts were not reported by petitioner as income. In 1980, petitioner sold the Navajo airplane and purchased a Beechcraft King aircraft for $ 622,500. He *484 used at least $ 200,000 of corporate funds for the down payment on the Beechcraft. He signed a note for the balance of the purchase price, and the Corporation made the payments on that note. The Corporation made payments of at least $ 287,500 in regard to the Beechcraft airplane. Petitioner continued the plane leasing activity, reporting the rental income on Schedule E of the 1980 return. Petitioner's unreported income and constructive dividends received from the Corporation in 1980 totaled $ 595,411, as follows: $  40,000
Money for daughter's home
94,000
Unreported bonus
50,000
Payment of personal loan
66,648
Corporation's CD
2,494
Net amount to pay estate taxes of Regina Y. Sell
35,451
Balance of loan on Navajo
19,318
Loan payments on Navajo
287,500
Payments on Beechcraft
$ 595,411
Petitioner's ledger cards show a total credit of $ 211,204.56 for 1980, [7] and we find that petitioner actually paid that amount to the Corporation that year. Therefore, petitioner's net withdrawal figure and unreported income for 1980 is $ 384,206.44 ($ 595,411 - $ 211,204.56). *485 3. 1981 Items and Transactions
Respondent's adjustments to petitioners' 1981 taxable income totaled $ 131,436.65 for constructive dividends. In 1981, petitioner used $ 3,621 of corporate funds to acquire an option to purchase stock in Garret Glenhaven, Inc., a corporation operating a pizza parlor know as the "Pizza Pub". Later in 1981, petitioner, Mrs. Sell, and three of their children (Greg, Ellen, and Christopher) formed a new corporation, Selco, Inc., in which they owned the stock equally. Petitioner contributed to Selco, Inc., the option to purchase stock in Garret Glenhaven, Inc. On December 30, 1981, Selco, Inc., exercised the option to purchase Garret Glenhaven, Inc. To effect the purchase, $ 80,340.55 of the Corporation's funds were used. Garret Glenhaven, Inc., was then liquidated, and Selco, Inc., began operations as the Pizza Pub. In 1981, the Corporation paid to, or on behalf of, petitioner $ 9,925 for insurance and $ 24,803.91 for loan payments with respect to the Beechcraft airplane. These amounts were not reported by petitioner as income for that year. In addition, the Corporation paid rent to him for use of the Beechcraft, and the rental payments were *486 included as income on his Schedule E for 1981. In 1981, the Corporation paid $ 1,000 to the Internal Revenue Service in part payment of petitioners' 1980 Federal income tax liability. Also in 1981, petitioner received cash from the Corporation in the amounts of $ 3,620.95 and $ 1,100.12. This sum of $ 4,721.07 did not constitute reimbursement for expenses and was not reported as income by petitioner. Petitioner's ledger cards show a total credit of $ 10,284.12 for 1981, and we find that petitioner actually paid that amount to the Corporation that year. Petitioner's ledger cards show a total credit of $ 10,284.12 for 1981, and we find that petitioner actually paid that amount to the Corporation that year. Petitioner's constructive dividends received from the Corporation in 1981 totaled $ 124,411.53, as follows: $ 3,621.00
Option
80,340.55
Purchase of Garret
Glenhaven, Inc.
9,925.00
Insurance on Beechcraft
24,803.91
Loan payments on Beechcraft
1,000.00
Federal income tax for 1980
4,721.07
Cash
$ 124,411.53
Therefore, petitioner's net withdrawal figure and unreported constructive dividend income for 1981 is $ 114,127.41 ($ 124,411.53 - $ 10,284.12). 4. *487 1982 Items and Transactions
Respondent's adjustments to petitioners' 1982 taxable income totaled $ 138,544 for constructive dividends. In 1982, a total of $ 20,418.37 was expended by the Corporation for goods or services purchased for the Pizza Pub: Item
Amount
Inventory
$ 12,414.50
Insect Killer
292.00
TV
2,014.95
Liquor License
34.50
Check #26705
3,064.90
Check #26652
987.52
Queen City Novelty
1,260.00
Jack Turney
350.00
Petitioner also received cash from the Corporation that year in the amount of $ 11,687, as follows: Date
Amount
January 4
$ 3,150
February 2
2,000
February 5
1,500
November 18
230
November 29
500
December 23
200
December 30
1,000
December 30
3,107
TOTAL:
$ 11,687
These cash amounts did not constitute reimbursement for expenses, and petitioner did not report these cash payments as income. In 1982, a Corporation check, dated July 15, 1982, in the amount of $ 7,071, was used to pay petitioners' Maryland income tax liability for 1980. Also in 1982, the Corporation paid an amount of $ 6,431.24 in partial payment of petitioners' Federal income tax liability for 1981. Petitioner endorsed over a Federal tax refund in *488 the amount of $ 8,089.60 to the Corporation and deposited the same into a Corporation account. Respondent has agreed that the adjustment for 1982 should be reduced by $ 8,089.60. [8] Therefore petitioner received a net amount of $ 5,412.64 ($13,502.24 - $ 8,089.60) in regard to these tax payments by the Corporation. Also in 1982, petitioner engaged in what has been referred to as the Magic Oven transaction. Petitioner testified that the Magic Oven Company owed the Corporation $ 55,000. Petitioner further testified that, since that company was on the verge of declaring bankruptcy, he went to the company and accepted equipment such as tables and chairs in order to cancel its debt to the Corporation. However, the documentary evidence indicates otherwise. Petitioner *489 signed a bill of sale in the amount of $ 21,000 for this equipment and wrote a corporate check in the amount of $ 21,000 made payable to Davis Trust, one of Magic Oven's creditors. Corporate funds were used to purchase this equipment, which equipment was used in the Pizza Pub's operations. Moreover, in 1982, Corporation funds were used for petitioner's personal expenses, totaling $ 5,672.70, as follows: [9]
Payee
Amount
McLaughlin, Huber
$ 660.00
District Court
105.00
House and Home
2,069.55
House and Home
1,474.20
Brownstone Furniture
1,363.95
Another Corporation check dated December 2, 1982, for $ 4,500 was made payable to "Ralph Sell" and was signed with petitioner's facsimile *490 signature stamp. In 1982, the Corporation made at least two payments to the Cumberland Savings Bank in regard to the loan for the Beechcraft airplane, check No. 42430 in the amount of $ 9,778.47 and check No. 43064 in the amount of $ 9,539.98, for a total of $ 19,318.45. The Corporation paid other expenses for the airplane. The Corporation also paid rent to petitioner for its use of the Beechcraft, and petitioner reported that rental income on his Schedule E for 1982. The additional amount the Corporation paid as expenses for the Beechcraft and miscellaneous additional amounts paid to or on behalf of petitioner, as recorded on his ledger cards, totaled $ 44,574.36, as follows: $ 25.00 14,786.9 5
2,490.0 0
2,000.00 1,000.00 4,000.00 20,272.41 Petitioner's constructive dividends received from the Corporation in 1982 totaled $ 132,583.52, as follows: $ 20,418.37
Pizza Pub
11,687.00
Cash
5,412.64
Net tax payments
21,000.00
Magic Oven
5,672.70
Miscellaneous personal expenses
4,500.00
Check
19,318.45
Loan payments on Beechcraft
44,574.36
Beechcraft expenses and
miscellaneous items paid
to or on behalf of petitioner
Petitioner's ledger cards show a total *491 credit of $ 72,820.06, and we find that petitioner in fact paid that amount to the Corporation in 1982. Therefore, petitioner's net withdrawal figure and unreported constructive dividend income for 1982 is $ 59,763.46 ($ 132,583.52 - $ 72,820.06). In addition, for the taxable year 1980, petitioners claimed an investment tax credit (ITC) of $ 57,429, most of which was attributable to the Beechcraft airplane purchased that year. Respondent disallowed a portion of the ITC because the amount deducted, as computed on petitioners' return, did not properly give effect to the statutory limitations of section 48(c) in effect for that taxable year. Petitioners had treated the airplane as new, rather than as used, section 38 property. [10]
*492 Petitioners did not present any evidence at trial regarding their claim that the airplane qualified as new rather than as used property. On brief, petitioners appear to concede the issue. In any event, we sustain respondent's disallowance of a portion of the ITC for the taxable year 1980, either as conceded by petitioners or for their failure to carry their burden of proof. OPINION Loans or Constructive Dividends
The first issue is whether the withdrawals petitioner made from the Corporation during the period from 1979 through 1982 were bona fide loans, as petitioner contends, or distributions taxable under sections 301 and 316, as respondent contends. Sections 301 and 316 provide that a distribution of property made by a corporation with respect to its stock is a taxable dividend to the extent of the corporation's earnings and profits. [11] "A constructive dividend is paid when a corporation confers an economic benefit on a stockholder without expectation of repayment." Williams v. Commissioner, 627 F.2d 1032, 1034 (10th Cir. 1980), affg. T.C. Memo. 1978-306 (quoting Wortham Machinery Co. v. United States, 521 F.2d 160, 164 (10th Cir. 1975)). *493 In deciding whether a shareholder's withdrawals from a corporation constitute loans or constructive dividends, we must consider whether, at the time of the withdrawals, the shareholder intended to repay the amounts received, and the corporation intended to require repayment. Miele v. Commissioner, 56 T.C. 556, 567 (1971), affd. without published opinion 474 F.2d 1338 (3d Cir. 1973). [12] Petitioner testified that the withdrawals from the Corporation were made by him with the intention to repay them. We give little weight to such self-serving testimony. Mere declarations of intent are not sufficient to show that the intrinsic economic nature of the transactions themselves is that of a debt rather than that of a constructive dividend. Williams v. Commissioner, 627 F. 2d at 1034; Alterman Foods, Inc. v. United States, 505 F.2d 873, 876-877 (5th Cir. 1974). *494 All of the facts and circumstances surrounding the withdrawals must be examined. Roschuni v. Commissioner, 29 T.C. 1193, 1201-1202 (1958), affd. per curiam 271 F.2d 267 (5th Cir. 1959). Respondent's determination that the withdrawals constitute constructive dividends, and therefore taxable income, is presumptively correct, and petitioner bears the burden of proving that respondent's determination is erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Miele v. Commissioner, supra at 567. Courts have considered the following objective factors in deciding whether withdrawals are constructive dividends or loans: (1) the extent to which the shareholder participates in the management of, and controls, the corporation; (2) the earnings and dividend history of the corporation; (3) the magnitude of the *495 advances and whether a ceiling existed to limit the amount the corporation advanced; (4) whether or not security was given for the loan; (5) whether there was a set maturity date; (6) whether the corporation ever undertook to force repayment; (7) whether the shareholder was in a position to repay the advances; and (8) whether there was any indication the shareholder attempted to repay the advances. Alterman Foods, Inc. v. United States, 505 F.2d at 877 n.7, and cases cited therein. Due to the factual nature of such inquiries, the above factors are not exclusive, and no one factor is determinative. We have always examined transactions between closely held corporations and their shareholders with special scrutiny. Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1339 (1971), affd. without published opinion sub nom. Jiminez v. Commissioner, 496 F.2d 876 (5th Cir. 1974). Petitioner did not own a majority of the Corporation's stock. However, he was involved in the daily operations of the business, controlled its operations in a practical sense, and treated the Corporation's funds as available to him for his own *496 personal or family use, when and as he alone saw fit. He alone made the decisions as to the timing, amount, and uses of the funds he withdrew. In addition, although petitioner asserted at trial that the Corporation had authorized loans to him, neither the Corporation's articles of incorporation nor its bylaws give such specific authorizations. [13] The other officers, shareholders, and board members (i.e., his wife, sister, and brother-in-law) did not authorize the withdrawals and did not know about the withdrawals until some time after the years before the Court. *497 Petitioner argued that he was merely continuing the practice of his father in borrowing from and repaying money to the Corporation. The record does not establish the existence of any practice of interest-free loans. See supra note 2. Furthermore, petitioner asserted, he was not advised by his accountants that promissory notes, interest, or repayment schedules were needed. Significantly, the record does not establish that he ever sought any advice from his accountants on these matters.[14] Petitioner placed much emphasis upon the fact that the Corporation reported the withdrawals as loans on its tax returns and financial statements, viewing this as evidence of his intention to repay the advances. This factor is not determinative without further evidence establishing the existence of bona fide loans. Crowley v. Commissioner, T.C. Memo. 1990-636. It is quite important to inquire whether the alleged lender had a good faith intent to enforce the repayment of the withdrawals. Electric & Neon, Inc. v. Commissioner, 56 T.C. at 1339; Beaver v. Commissioner, 55 T.C. 85, 91 (1970). As noted above, the other shareholders, *498 officers and directors of the Corporation, in this case, did not even know of petitioner's withdrawals until 1983 or 1984. The Court is satisfied that no bona fide loan arrangement was in effect, and that the Corporation was not in a position to demand or enforce repayment at any time during the years before the Court. Although transactions between closely held corporations and their shareholders are often conducted in an informal manner, the informality relating to the withdrawals in question goes beyond what we would expect with respect to purported loans of this magnitude. [15] *499 Only the recording of loans to shareholders on the tax returns and financial statements supports petitioner's contention that loans were intended. Electric & Neon, Inc. v. Commissioner, supra.By all other indications, or lack thereof, there was no expression of any obligation on the part of petitioner to replenish the corporate treasury. Electric & Neon, Inc. v. Commissioner, supra.The advances were only evidenced by sales tickets or by the checks written by petitioner and posted to his ledger card. There were no set maturity dates or events of default that would require petitioner to remit any of the funds at any certain time or indeed ever. There were no limits upon the amount of the corporate advances. Moreover, petitioner did not pledge any security for the advances. Petitioner argues to the contrary. Petitioner claims that he had sufficient personal assets during the years in issue *500 to repay the withdrawals and that he could have, and in fact did, surrender the Corporation stock to partially satisfy the debt. However, the repayment of a corporate debt by the surrender of that Corporation's stock generally weakens a taxpayer's argument. Crowley v. Commissioner, T.C. Memo. 1990-636. Petitioner's argument is indeed weakened in this case. We view the surrender of petitioners' stock in the Corporation merely as a means of exiting the Corporation without liquidating any personal assets and, at the same time, turning the Corporation over to their children. [16]
Petitioner notes that the advances *501 were not in proportion to his stock ownership in the Corporation. It is well settled that a disbursement of corporate earnings to a shareholder may constitute a dividend to such shareholder notwithstanding that it is not in proportion to stock holdings or that some shareholders do not participate in its benefits. Roschuni v. Commissioner, 29 T.C. at 1204. In fact, Mr. and Mrs. MacVeigh complained about the magnitude of petitioner's withdrawals and required the negotiation of a restitution agreement with petitioner as to how much he would repay to the Corporation. Petitioner asserts that the restitution agreement demonstrates his intention to create a loan arrangement with the Corporation from the outset. However, unlike petitioner's interpretation, we conclude that the agreement demonstrates that petitioner did not intend to enter a formal debtor-creditor relationship with the Corporation from the outset. He only agreed to do so when the withdrawals came to the attention of the MacVeighs and, after two years of negotiations between the two families and their respective lawyers, petitioner was compelled to agree to make restitution to the Corporation. Usually, *502 a shareholder's repayments are strong evidence that a withdrawal was a loan. The repayments, though, must be bona fide. Under the facts of this case, we cannot find that petitioner established a bona fide debtor-creditor relationship with the Corporation at any time before the execution of the restitution agreement in August of 1986. However, we have found that the credits noted on petitioner's ledger cards are convincing evidence that he did make some repayments to the Corporation, and hence, we have revised respondent's adjustments to petitioners' taxable income to reflect petitioner's net withdrawals. See Crowley v. Commissioner, T.C. Memo. 1990-636. The payment of interest also has a bearing on the issue of a taxpayer's intent to repay. The Corporation, however, did not charge or receive any interest on petitioner's withdrawals until the Sells and the MacVeighs entered into the restitution agreement in 1986. Thus, in summary, petitioners have failed to carry their burden of proving that petitioner intended to repay all of the amounts withdrawn during the years at issue at the time such amounts were withdrawn, or that the Corporation intended to enforce *503 repayment at that time. The facts belie any intention to create a real debtor-creditor relationship at the time of the withdrawals. Only after the MacVeighs forced a confrontation in 1986 regarding this issue did petitioners enter into a formal loan agreement to repay principal and interest. Accordingly, we find the net amounts that petitioner withdrew during 1979, 1980, 1981, and 1982 to be, in substance, dividend distributions that are taxable to petitioners. Innocent Spouse Issue
When a husband and wife file a joint return, each is jointly and severally liable for the amount of tax due. Sec. 6013(d)(3). However, section 6013(e) relieves a spouse of joint liability if he or she meets its requirements. Under section 6013(e), a person seeking innocent spouse status must meet various statutory requirements in order to be granted relief from liability for the tax. The spouses must have filed a joint return for the taxable year at issue under section 6013. There must have been a substantial understatement of tax attributable to the grossly erroneous items of the other spouse. The spouse seeking relief must establish that he or she did not know, nor have reason to know, *504 of the substantial understatement. Also, considering all of the facts and circumstances, it must be inequitable to hold the spouse seeking relief liable for the deficiency attributable to the substantial understatement. Sec. 6013(e)(1); Flynn v. Commissioner, 93 T.C. 355, 359 (1989). There are also requirements relating to the "preadjustment year". Sec. 6013(e)(4). The spouse claiming such relief has the burden of proving that he or she has satisfied each statutory requirement of section 6013(e). Failure to prove any one of the statutory elements will prevent him or her from qualifying for relief. Rule 142(a); Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Bokum v. Commissioner, 94 T.C. 126, 138 (1990). Respondent does not challenge that the first requirement of section 6013(e) has been met. However, respondent contends that Mrs. Sell has satisfied the second requirement only as to the deficiencies attributable to the omitted income, but not as to the investment tax credit. Respondent also contends that Mrs. Sell either knew or had reason to know of petitioner's *505 withdrawals from the Corporation. Lastly, respondent asserts that it would not be inequitable to hold Mrs. Sell liable for the deficiencies in this case under the existing facts and circumstances. No issue is raised under section 6013(e)(4). In considering cases of this nature, this Court is mindful that, in enacting section 6013(e), Congress intended to remedy a perceived injustice and we "should not hinder that praiseworthy intent by giving the exception an unduly narrow or restrictive reading." Sanders v. United States, 509 F.2d 162, 166-167 (5th Cir. 1975). [17]
1. Grossly Erroneous Items
Any item omitted from gross income is grossly erroneous. Sec. 6013(e)(2)(A). Petitioners' 1979 through 1982 returns omitted a total of $ 585,746.59 from gross income, as found by the Court. Respondent does not challenge the fulfillment of this requirement. Thus, Mrs. Sell meets the grossly erroneous requirement for these *506 omissions. However, respondent argues that Mrs. Sell has failed to meet her burden of proving that the ITC was a grossly erroneous item. Respondent cites Purcell v. Commissioner, 86 T.C. 228, 239-240 (1986), affd. 826 F.2d 470 (6th Cir. 1987), for the proposition that to permit an allegedly uninformed spouse to avoid joint liability merely by showing that a deduction or credit was improperly taken, or by conceding that adjustment, would have the effect of placing the uninformed spouse in a position superior to the negligent spouse and eliminate the requirement in section 6013(e)(2)(B) that there must be no basis in fact or law for the deduction or credit. See also Purcell v. Commissioner, 826 F.2d at 475. However, the Court of Appeals for the Sixth Circuit in Purcell also makes it clear that The purpose of the innocent spouse rule is to protect one spouse from the overreaching or dishonesty of the other. Where there is an arguable factual or legal basis for claiming the deduction in the tax year for which the return is filed, it is likely that a fully informed spouse would have joined in the return. Purcell v. Commissioner, 826 F.2d at 475. *507 In this case, unlike the facts in Purcell, there is no middle ground for contrary legal arguments and conclusions regarding the ITC in question. As in Douglas v. Commissioner, 86 T.C. 758, 762-763 (1986), we conclude here that "A deduction has no basis in law when the expense, even if made, does not qualify as a deductible expense under well-settled legal principles or when no substantial legal argument can be made to support its deductibility". Respondent's finding that the airplane was used property rather than new property is presumptively correct and has not been challenged by petitioners. Consequently, there was no basis in fact or law for the full ITC taken by petitioners as if the airplane were new property. Therefore, this item does qualify as a grossly erroneous item under section 6013(e)(2)(B), and Mrs. Sell has met this second requirement. T2. Knowledge of the Understatements
Mrs. Sell must establish that, in signing the returns, she did not know, nor have reason to know, that substantial understatements of income existed. Sec. 6013(e)(1)(C). In determining whether Mrs. Sell had reason to know of the substantial understatements of tax, *508 the test is whether a reasonably prudent person under Mrs. Sell's circumstances,(e.g., level of intelligence or education, emotional state, level of involvement in the financial transactions giving rise to the income, etc.) at the time of signing the return, could be expected to know of the substantial understatements or that further investigation was warranted. Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Shea v. Commissioner, 780 F.2d 561, 565-566 (6th Cir. 1986), affg. on this issue T.C. Memo. 1984-310; Ratana v. Commissioner, 662 F.2d 220, 224 (4th Cir. 1981), revg. in part, affg. in part and remanding T.C. Memo. 1980-353; Bokum v. Commissioner, 94 T.C. at 148. Significant factors in determining whether a spouse had reason to know of a substantial understatement of tax include: (1) the alleged innocent spouse's participation in business affairs or bookkeeping ( Quinn v. Commissioner, 62 T.C. 223, 230-231 (1974), affd. 524 F.2d 617 (7th Cir. 1975)); (2) the culpable spouse's *509 refusal to be forthright concerning the couple's income ( Adams v. Commissioner, 60 T.C. 300, 303 (1973)); and the presence of unusual or lavish expenditures [18] ( Mysse v. Commissioner, 57 T.C. 680, 699 (1972)). The issue is a question of fact. Shea v. Commissioner, 780 F.2d at 565-566. In our view, Mrs. Sell did not know, nor have reason to know, that her husband was withdrawing large sums of money from the Corporation, and therefore, did not know, nor have reason to know, of the omission of these amounts from the joint tax returns she filed with her husband. We found Mrs. Sell to be a highly credible witness. We conclude that, at the time she signed the tax returns at issue, Mrs. Sell had no actual *510 knowledge, nor reason to know, of the substantial understatements of tax attributable to her husband's constructive dividends from the Corporation. In reaching this conclusion, we considered the roles played by petitioner and Mrs. Sell in the family's business activities and decisions. Petitioner primarily ran the Corporation. Mrs. Sell had no knowledge of and little involvement with the family business. Mrs. Sell had little interest in financial matters and no bookkeeping training. Petitioner made all of the financial decisions for the family, albeit he gave Mrs. Sell a checking account and a relatively steady allowance for household spending. Petitioner would pay all of the major family bills, such as the mortgage, the utilities, and the like. Mrs. Sell did not have access to petitioner's personal bank accounts nor to the Corporation's bank accounts. There is no evidence of lavish gifts or a lavish lifestyle. Therefore, we conclude that Mrs. Sell had no knowledge, and had no way of knowing, of any increases in petitioner's personal bank accounts resulting from deposits of money from Corporation accounts. The second factor we considered is the culpable spouse's refusal *511 to be forthright about the family income. Petitioner would not discuss business and financial matters with Mrs. Sell. She often found out about purchases and transactions after they had occurred. She was led to believe that petitioner had arranged for loans from bank officers with whom he was friendly or had made the purchases for corporate purposes. There is evidence that, even if Mrs. Sell had asked questions regarding financial matters, she would have been told not to worry and to continue her focus on the family, home, and community. Respondent argues that Mrs. Sell did have warning signals and should have more closely examined her returns. Respondent relies on Dickey v. Commissioner, T.C. Memo. 1985-478, for the proposition that petitioner should be reasonably charged with knowledge of the understatements because she remained intentionally ignorant of the source of funds for the purchases of the airplane, their daughter's house, the Red House, and the like. The evidence is to the contrary. Even the daughter and her husband thought the money for the purchase of their home came from the bank and thought they were making monthly payments to the bank. *512 Petitioner did not let his wife, sister, brother-in-law, or children know what he was doing with the Corporation's money. Respondent further asserts that this case in most respects is squarely on point with Shea v. Commissioner, 780 F.2d 561 (6th Cir. 1986). We disagree. In Shea, the spouse seeking relief was found not to be an innocent spouse because she had reason to know of the omitted income. She was actively involved in her husband's corporation as secretary-treasurer. She was authorized to write corporate checks, and she made deposits into the corporate account. Corporate checks were issued for nonbusiness purposes to the order of the spouse seeking relief, to her husband, to cash, and to other payees on their behalf. Her husband would use her checking account without her permission, but with her knowledge, and he controlled the reconciliation of the bank statements for such account each month. Shea v. Commissioner, supra at 563-564. The evidence of record does not support respondent's reliance on Shea. In contrast, here, Mrs. Sell did not have access to her husband's and the Corporation's bank accounts, and petitioner *513 did not use Mrs. Sell's personal checking account. Although, as has come to light, petitioner issued corporate checks for nonbusiness purposes, Mrs. Sell was unaware that he was paying for their personal and family expenses with withdrawals from the Corporation. She had no cause to question these expenditures because her lifestyle was commensurate with the amounts of income reported. The reported income for the years in issue was sufficient to sustain the lifestyle in which the family was living. Terzian v. Commissioner, 72 T.C. 1164, 1171 (1979). We do not think that Mrs. Sell "closed her eyes" to unusual or lavish amounts of income or expenditures. Mysse v. Commissioner, supra. The reason-to-know standard imposes a "duty of inquiry" on the spouse claiming relief. Stevens v. Commissioner, 872 F.2d at 1505. One cannot turn a blind eye to facts that might give reason to know of unreported income. Terzian v. Commissioner, 72 T.C. at 1170. However, although we can fault Mrs. Sell for not reading her tax returns before signing them, this fact does not lead us to the conclusion that she had reason *514 to know of the omitted income. Terzian v. Commissioner, supra at 1171. Here, if Mrs. Sell made any inquiries, she was told not to worry about business matters and that she should concentrate on running the household and participating in community activities. In fact, Mrs. Sell had little reason to inquire, because the money she received from petitioner was relatively stable and modest in amount, and the family's lifestyle did not perceptibly change during the years at issue. She was led to believe that the Red House, the mobile home, the airplane, and other assets in question were corporate assets, and she took steps to rectify the situation when she finally did come to know of petitioner's withdrawals of corporate funds. The third factor to have been considered is the presence or absence of unusual or lavish expenditures. The record does not disclose any unusual or lavish expenditures that would have alerted Mrs. Sell to unreported income. The only out-of-the-ordinary expenditure made during the years at issue was the redecorating of petitioners' home at an expense of $ 10,000 to $ 15,000. In light of petitioner's position as president of a company *515 considered to be doing well at the time and his salary level, as well as petitioner's explanation of having received a bonus, we do not consider this expenditure to have been one that would have alerted Mrs. Sell to realize that petitioner was making substantial withdrawals from the Corporation. In summary, Mrs. Sell did not participate in the family's business affairs, nor did she have access to the majority of the family's finances so that she would have reason to know of the omitted income. She did not experience a lavish or unusual lifestyle during the years in question. Petitioner was not forthcoming to her about the various business and financial transactions in which he was engaged. Thus, we conclude that Mrs. Sell did not know, nor have reason to know, of the substantial withdrawals that petitioner was making from the Corporation during the years at issue. [19]
3. Inequitable to Hold Mrs. Sell Liable
In assessing the equity in *516 holding a spouse liable, we consider (1) whether the spouse claiming relief significantly benefited from the grossly erroneous items attributable to the culpable spouse ( Estate of Krock v. Commissioner, 93 T.C. 672, 677 (1989)); (2) whether the spouse claiming relief has been deserted by, or divorced or separated from, the culpable spouse ( sec. 1.6013-5(b), Income Tax Regs.); and (3) probable future hardships that would be visited upon the innocent spouse if she is not relieved from liability ( Sanders v. United States, 509 F.2d 162, 171 n.16 (5th Cir. 1975)). In determining whether or not it is inequitable to hold Mrs. Sell liable for the understatements of income or additions to tax, a factor to be considered is whether the person seeking relief significantly benefited, directly or indirectly, "from the items omitted from gross income". Sec. 1.6013-5(b), Income Tax Regs. However, normal support is not considered a "significant benefit". Estate of Krock v. Commissioner, 93 T.C. at 678-679; Terzian v. Commissioner, 72 T.C. at 1172; sec. 1.6013-5(b), Income Tax Regs.[20] Normal support is determined by *517 the circumstances of the parties. Sanders v. United States, 509 F.2d at 168; Flynn v. Commissioner, 93 T.C. at 367. Respondent contends that it would not be inequitable to hold Mrs. Sell liable for the portion of the deficiency attributable to petitioner's withdrawals from the Corporation because Mrs. Sell benefited from this money. We disagree. The record shows no significant benefit to Mrs. Sell from her husband's withdrawals of money from the Corporation. Certainly, the benefits she may have received from a few trips on the airplanes or through the use of the company gasoline credit card were insubstantial. Petitioner and Mrs. Sell were never divorced, but Mrs. Sell has convinced us that, despite living under the same roof, they had grown quite apart. We have little doubt that Mrs. Sell would suffer grave hardship if forced to pay for her husband's business mismanagement and unreported dividend *518 income. Since Mrs. Sell did not receive any substantial benefit from these withdrawals from the Corporation, we conclude that it would be inequitable to hold her liable for petitioner's actions. In conclusion, we hold that Mrs. Sell meets all of the statutory requirements of section 6013(e)(1) as an innocent spouse. Therefore, she is relieved of liability for the tax deficiencies and for any additions to tax attributable to the substantial understatements attributable to her husband's grossly erroneous items. Sec. 6013(e)(1) (flush language). Additions to Tax
Respondent has determined additions to tax under sections 6651(a)(1), 6653(a) or (a)(1) and (2), and 6661. 1. Section 6651(a)(1) Addition to Tax
Respondent determined an addition to tax under section 6651(a)(1) for failure to file timely the return for the taxable year 1980. Respondent granted, at the request of Mr. Reinecke, two extensions of time to file the 1980 return. Mr. Reinecke represented that petitioner was ill and unable to fully participate in gathering the documents necessary for the preparation of the corporate and individual returns. The filing due date for petitioners' individual income tax *519 return for 1980 was extended to November 16, 1981. The return was filed on December 28, 1981. To avoid the addition for failure to file a return on its due date, the taxpayer bears the burden of proving that the failure did not result from willful neglect and that the failure was due to reasonable cause. Sec. 6651(a)(1); United States v. Boyle, 469 U.S. 241, 245 (1985). "Willful neglect" includes a conscious, intentional failure or reckless indifference to timely filing a return. United States v. Boyle, supra at 245. The taxpayer also must demonstrate that he exercised ordinary business care and prudence but nevertheless was unable to file the return within the prescribed time. United States v. Boyle, supra at 245; sec. 301.6651-1(c)(1), Proced. & Admin. Regs. The record makes it clear that petitioner's accountants were unable to prepare either the corporate returns or the individual returns in a timely manner because of the Corporation's inadequate ledger card system. For many years before 1980 and 1981 and before the onset of petitioner's alcoholism, the accountants year after year had advised petitioner *520 to change the Corporation's ledger card system. Petitioner ignored their advice. The corporate and individual returns were routinely filed late, beyond the extended due dates, for all of the years before the Court. Although we understand that the 1980 year (and possibly 1981) was a trying one for the Sell family, as the family members were trying to come to terms with petitioner's drinking problem, nevertheless petitioner had the responsibility of making records available to the accountants in 1981 and assisting them as much as possible in the preparation of the 1980 return during the two extension periods granted for filing. Moreover, the record shows that petitioner's drinking had tapered off, and he did not again begin drinking to excess until December of 1981. The 1980 return was filed December 28, 1981, so the alcoholism would appear to have had little to do with the late filing of the 1980 return. In any event, petitioner did not exercise ordinary business care and prudence in this matter. We conclude that petitioner's illness falls short of the reasonable cause requirement of the statute. Also, the pattern of late filing supports a finding of willful neglect. We therefore *521 uphold respondent's determination of an addition to tax under section 6651(a)(1). 2. Section 6653(a) or (a)(1) and (2) Additions to Tax
Respondent has also determined additions to tax under section 6653(a) or (a)(1) and (2) for all of the years before the Court. Section 6653(a) or (a)(1) provides an addition to tax for negligence or intentional disregard of rules or regulations. Negligence is a lack of due care or a failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner has the burden of establishing error in respondent's determination of additions of tax under section 6653(a) or (a)(1). Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Petitioner has not carried his burden. Moreover, the record in this case amply supports a finding of both negligence and intentional disregard of rules or regulations. Both the Corporation and the individual petitioners routinely filed their tax returns late, beyond the due dates as extended, over the entire 4-year period involved in this case. The Corporation's ledger card system *522 caused the delay in preparing and filing these returns, and although advised by the accountants year after year to change the system, petitioner took no action to do so. The Court sustains the negligence additions to tax for the taxable years in issue. 3. Section 6661 Addition to Tax
Respondent also determined an addition to tax under section 6661 for the year 1982. Section 6661(a) imposes an addition to tax for a substantial understatement of income tax. The understatement is "substantial" if it exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $ 5,000. Sec. 6661(b)(1)(A). The understatement of tax for the taxable year 1982 was substantial in this case. Section 6661(b)(2)(B) reduces the amount of the understatement potentially subject to the addition if the taxpayer has substantial authority for his position or adequately discloses on the return or in a statement attached to the return the relevant facts affecting the item's tax treatment. Section 1.6661-3, Income Tax Regs., defines "substantial authority". On this record, petitioner has not met these requirements, and we have no basis for reducing the understatement. *523 Petitioner argues that the Corporation's tax return listed loans to shareholders on the Schedule M of that return. However, the Corporation is a separate legal entity, and a disclosure on its return would not constitute a disclosure by petitioner on his individual return. Moreover, the mere listing of a figure for loans to shareholders would not disclose that petitioner was making unauthorized withdrawals of corporate funds for his personal or family use. We sustain respondent's determination of a substantial understatement of income tax for 1982. Conclusion
In summary, we hold that petitioner's net withdrawals from the Corporation constitute taxable constructive dividends and that he is liable for various additions to tax as determined by respondent. However, based on the record as a whole, we conclude that Mrs. Sell did not know, nor have reason to know, of petitioner's withdrawals and that she did not significantly benefit from the constructive dividends received by petitioner from the Corporation. We therefore conclude that, in each of the years at issue, Mrs. Sell is entitled to relief under section 6013(e) as an innocent spouse. To reflect the above holdings, *524 Decision will be entered under Rule 155. Footnotes
1. Ralph F. Sell, Jr., died on July 31, 1991. Accordingly, the caption of the case has been changed to reflect that fact and to substitute his estate as a party. For convenience, Ralph F. Sell, Jr., will continue to be referred to as a petitioner herein.↩
1. plus 50 percent of the interest on the deficiency pursuant to sec. 6653(a)(2)↩.
2. Petitioner testified that the Corporation had a continuing policy of making loans to its officers and employees without interest and that such interest-free loans were expressly authorized by the Corporation's charter and bylaws. Petitioner's testimony was incorrect. The corporate charter and bylaws are silent in that regard. Also, the record does not show that the Corporation made interest-free loans to other officers, stockholders, or employees. The Court found John MacVeigh's testimony on this matter to be more credible than petitioner's testimony.↩
3. As will be discussed below, Mrs. Sell formally transferred these assets to the Corporation upon learning that petitioner had titled the property in their names rather than in the name of the Corporation.↩
4. This $ 50,000 corporate loan is not to be confused with another $ 50,000 amount that petitioner, in his individual capacity, borrowed from Citizens National Bank on November 7, 1979, and deposited into his personal account at Cumberland Savings Bank. In 1980, the Corporation paid petitioner's personal loan.↩
5. In the statutory notice of deficiency, respondent determined an adjustment of $ 473,553.29. The principal difference between the figure in the statutory notice and the one the parties have stipulated is the credit given for a $ 94,000 bonus that was treated previously as reported income and for which a credit was improperly given in the statutory notice. However, the figure in the parties' second stipulation of facts and the figure as orally corrected on the record are both slightly in error.↩
6. Mrs. Sell arranged for the transfer of title to the Corporation in 1984 under the power of attorney she had received from her husband. Respondent argues that this transfer, as well as others made by Mrs. Sell at that time, amounted to an attempt to shield certain assets from personal liability. We find in regard to the Red House that Mrs. Sell, acting under legal advice, was merely trying to title in the Corporation's name an asset that was intended to be a corporate asset all along.↩
7. This figure does not include a credit for the tax refund discussed above. In addition, Mr. Huber stated that there were $ 13,246 of deposits of personal funds during 1980; however, our analysis of the ledger cards finds deposits of $ 12,204.56.↩
8. On petitioner's ledger card, the amount credited was $ 8,089.60. Mr. Huber showed the figure as $ 9,090. The stipulated figure of $ 8,890.60 is in error and will be disregarded. Jasionowski v. Commissioner, 66 T.C. 312, 318↩ (1976).
9. Petitioners objected to respondent's requested finding of fact to this effect, pointing out that paragraphs 34 and 35 of the First Stipulation of Facts do not state that these expenses were personal expenses. However, these amounts are reflected as charges to petitioner on his ledger cards (Ex. 11, white p.3, yellow p.8).↩
10. Sec. 46(a) permits an investment tax credit for any taxable year, using the applicable percentage of basis of sec. 38 qualified investment property. New sec. 38 property with a ten year useful life would be entitled to a credit equal to the applicable percentage of basis attributed to the first year, i.e., 100 percent of one-tenth of the purchase price. Sec. 46(c)(1) and (c)(2). However, used sec. 38 property is subject to the limitation of sec. 48(c)(2)(A), which provides that "The cost of used section 38 property taken into account under section 46(c)(1)(B) for any taxable year shall not exceed $ 100,000."↩
11. The parties agree that the Corporation had sufficient earnings and profits for this purpose.↩
12. See Crowley v. Commissioner, T.C. Memo. 1990-636, affd. 962 F.2d 1077↩ (1st Cir. 1992).
13. Under most standard incorporation documents, as the Corporation's charter and bylaws in this case, specific approval by a company's board of directors is required before major expenditures of corporate funds can be made. Article V of the Corporation's bylaws titled "Contracts, Loans, Checks and Deposits" instructs that the board of directors may authorize by resolution, either generally or confined to specific instances, officers or agents of the Corporation to act on the Corporation's behalf in entering contracts, loans, and/or payments of money. In addition, Section 12 of Article II provides "Informal Action by Shareholders. Unless otherwise provided by law, any action required to be taken at a meeting of shareholders, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the shareholders entitled to vote with respect to the subject matter thereof." Mr. MacVeigh never personally borrowed any money from the Corporation, had no understanding about whether or not other officers would be able to borrow money from the Corporation, nor had he ever authorized any shareholder to borrow money from the Corporation. See supra↩ note 2.
14. From observing Mr. Huber, the accountant who testified, the Court finds it highly unlikely that this accountant would have volunteered such advice to petitioner, a forceful and strong-willed individual, who ran the business the way he wanted to. On the one issue on which the accountants repeatedly gave accounting advice -- to change the ledger card system -- petitioner simply ignored that advice and paid no heed to his accountants.↩
15. See Crowley v. Commissioner, T.C. Memo. 1990-636↩.
16. In 1990, the MacVeighs received the real estate that was owned by the Corporation, appraised at $ 453,000, in exchange for their stock. At the same time, the Sells surrendered their stock to the Corporation in exchange for a credit of $ 453,000 against the amount due under the restitution agreement. Christopher Sell and Ellen Sell Torrington presently own and operate the Corporation.↩
17. See Schneider v. Commissioner, T.C. Memo. 1992-96↩.
18. Moreover, an increase in a couple's general standard of living may also put a spouse on notice of unreported income. Flynn v. Commissioner, 93 T.C. 355, 366 (1989); Mysse v. Commissioner, 57 T.C. 680, 698-699↩ (1972).
19. See Mann v. Commissioner, T.C. Memo. 1992-191↩.
20. See also Hayes v. Commissioner, T.C. Memo. 1989-327↩.